NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

JONATHAN SIERRA,                  :
                                  :
              Petitioner,         :          Civil Action No. 11-1860 (RMB)
                                  :
      v.                          :          **O P I N I O N**
                                  :
GREG BARTOWSKI, et al.,           :
                                  :
              Respondents.        :

---

**BUMB**, District Judge:

Petitioner Jonathan Sierra ("Petitioner") filed a petition for a Writ of Habeas Corpus ("Initial Submission"), pursuant to 28 U.S.C. § 2254(a), challenging a judgment of conviction entered by the Superior Court of New Jersey.  See Docket Entry No. 1.  Because Petitioner's initial filing, being a 220-page submission, prevented this Court from understanding Petitioner's challenges, the Court advised Petitioner of his rights under Mason v. Meyers, 208 F.3d 414 (3d Cir. 2000), and directed Petitioner to clarify his grounds in a subsequent submission.  See Docket Entries Nos. 1-2.  Petitioner duly filed a supplement ("Petition") stating, with a sufficient degree of clarity, Petitioner's claims and supporting facts.  See Docket Entry No. 3.  Respondents answered the Petition and filed the underlying record,[1] and Petitioner traversed (with a 207-page traverse mostly replicating his Initial Submission and his state-court briefs).  See Docket Entries Nos. 8 and 11.  For the reasons detailed below, the Petition will be denied, and no certificate of appealability will issue.

---

[1] The Court notes excellent indexing and organization of Respondents' exhibits.

## I.   <u>BACKGROUND</u>

Since both the facts of this matter and the procedural developments that took place during state court proceedings appear rather complicated, the Court finds it warranted to set forth both these aspects in sufficient detail.

### A.   <u>Facts Associated with the Offenses Petitioner Was Convicted Of</u>

Addressing Petitioner's direct appellate challenges, the Superior Court of New Jersey, Appellate Division, detailed the facts underlying Petitioner's conviction as follows:

> In the early evening of November 1, 1997[,] Archie Carmen Riddick [("Archie")] and his "live-in" girlfriend, Ana Cupeles [("Ana")], dropped off their three children at the home of Laura Cupeles [("Laura")], Ana's sister, so [Archie and Ana] could celebrate [Archie's] birthday with his mother and father at Wash's Inn in Pleasantville.  [Archie] and Ana were at Wash's from about 6 p.m. until 10:30 p.m., drinking, eating and talking.  [Archie], who was a "social drinker," drank beer and a few "shots" with his father, while Ana, who drank only on special occasions, drank cranberry juice and vodka. . . .  At some point during the evening, [Archie] received a telephone call at Wash's from his children.  When he returned to the table, he told Ana to finish her drink because they had to leave to pick up the children.  When [Archie] and Ana left the tavern at about 10:30 p.m. neither of them appeared under the influence [in the opinion of Archie's] parents [who] were not concerned about them driving home or picking up the children.  Ana [however,] said she was intoxicated when she left and did not remember the ride from Wash's to her sister's.  When they arrived at Laura's house, [Laura] was on the front porch.  She saw Ana get out of the passenger side of the car "holding her stomach, falling to the ground" and crying.  Laura ran up to her sister and asked what was wrong; Ana replied, "nothing."  Laura then asked [Archie] what was wrong, and he too said, "nothing," and explained that Ana was "just drunk," which, based on Laura's observations, appeared reasonable [to Laura].  Laura and [Archie, however,] then began to argue about whether the children should stay overnight with Laura, who did not want the children to drive with him because she thought he was drunk too.  Despite the argument, Laura did not feel threatened by [Archie]; nor did she feel the need to seek help.
>
> At that point, Pedro Sierra ("Peter"), Laura's boyfriend, came over to the car and asked what was wrong.  [Archie] got out of the car and said, "I'm taking my f***ing kids."  Peter hit [Archie] and a fight developed between the two men.  Then, [Petitioner, who was] Peter's brother, [and] who had been staying at Laura and Peter's house, joined in the fight.  Both Peter and [Petitioner] were hitting and

kicking [Archie].  When [Petitioner and Peter] stopped hitting [Archie], he got up from the ground; Peter then started to go after [Archie] with a broken beer bottle. Laura jumped in front of Peter and told him not to hit [Archie].  On this break in the action, [Archie] "ran" to his car and "sped off," leaving Ana and the children behind.  . . .  After [Archie] arrived home, he called his brother "Spud" at about midnight.  [Archie] told Spud what had happened and said that Laura would not give him his children.  [He also] said he was too drunk to fight, he was not going to leave the house, and he was going to sleep.  . . . [However, Archie] did not go to sleep.  He called Laura's house to apologize to Peter, but Peter would not speak with him on the telephone.  Shortly after Laura got off the phone with [Archie], Ana called [Archie] and told him to come back to Laura's house to pick up [her] and the children.  While [Archie] was driving to get Ana, Spud called Laura to find out what was going on.  While Laura was on the phone with Spud, [Archie] arrived at the house just as Ana and the children were on their way [out].  Laura hung up on Spud and went to the front door where [Archie] was now standing. . . . [Archie] and Laura began arguing again about whether he should drive with the children.  As [Archie] was standing on the front steps talking with Laura, Peter ran up to him, pushed him to the side of the house and knocked him to the ground. A second fight ensued between them as [Archie] was trying to defend himself. Then, [Petitioner] and his two cousins, David and Andrew Gonzalez, joined the fight and were hitting [Archie] as well.  Laura and Ana both interceded.  Ana tried to cover [Archie]'s body with her own while begging [Petitioner] and his cohorts to stop beating him but they did not stop.  Laura tried to get [Archie] off Peter, then tried to get Ana off [Archie], and then tried to pull defendant and Peter off [Archie], but without success.

At a point while defendant and Peter were still beating the victim, Laura saw [Archie] "go limp."  [Petitioner, Peter and Petitioner's] cousins then got up and left the scene, although Laura did not see where they went.  As [Archie] was trying to get up on his knees, Laura was finally able to pull Ana off [him]. Neither Laura nor Ana rendered aid to [Archie] at that point because neither knew he had been stabbed.  Laura thought he was just "beat down."  After a few moments, Laura and Ana went into the house, leaving [Archie] lying on the ground.  Eventually, Laura looked outside to see if [Archie's] car was still in front of her house.  It was.  The car lights were on and the engine was still running.  At that point, [Laura] went to the side of the house and found [Archie] laying on the ground on his back moaning.  Laura and Ana tried to get [Archie] up but "he wouldn't move."  Laura noticed that the victim was "beat up," his eyes were rolled back in his head and he "obviously looked like he was in pain."  Laura told [Archie's] two daughters to call 911.

When Officers Richard Tomasello and Christopher Leeds of the Plesantville Police Department arrived, [they saw the] scene [they described as] "chaos." Children were "running around screaming."  Ana . . . was crying and screaming

that her "boyfriend was hurt." The officers observed [Archie] lying on the grass by the side of the house; he was bleeding from his nose, mouth and the left side of his chest. He was semiconscious and unresponsive. . . . Emergency medical personnel arrived. Despite their efforts, they were unable to revive [Archie]. He was pronounced dead at the scene. A subsequent autopsy revealed that [Archie] had sustained three knife wounds. One wound was "superficial," having penetrated [his] body one-quarter of an inch. The other two wounds, however, penetrated [his] left lung and the pericardial sac surrounding his heart. [Archie] also sustained two fractured ribs. The cause of death was internal hemorrhage due to stab wounds of the back with penetration of the left lung and heart.

Shortly after arriving at the scene, Officer Leeds, along with Officer Vaughn Howze, who arrived as backup, were ordered to check inside the house for Peter. He was not there. While in the house, Officer Leeds observed two knives, one on the counter and the other in the sink in a pot of dish water. While police were still at the scene, Peter called the house. One of the children asked Officer Howze to speak with him. The officer introduced himself to Peter, told him they needed to speak with him about the fight earlier that evening, and asked him to either come home or tell them where he was so an officer could be sent to speak with him. But Peter, who seemed "anxious" and "upset," hung up the phone. After obtaining a description of the car which Peter may have driven away, a police radio broadcast was sent out to the surrounding areas. At about 2:30 a.m. the car in which Peter . . . and . . . Andrew and David Gonzalez, were riding was stopped in Egg Harbor Township. As the result of information received from them, Investigator Larry Wade of the Atlantic County Prosecutor's Office and Detective Rocky Nelendez of the Pleasantville Police Department, went to the home of [Petitioner's] cousin, Vanessa Gonzalez, in Atlantic City. After a few minutes Vanessa opened the door. She told police that [Petitioner] was in the bedroom. Once in the bedroom, police observed a person, who turned out to be [Petitioner], laying in the bed covered from head to toe. Next to [Petitioner] were two sleeping young children.

Eventually, [Petitioner] complied with the officers' demands to come out from under the covers. He was taken into custody and brought to police headquarters where he gave a taped statement to police. His clothing was confiscated by police. Testing revealed blood on [Petitioner's] right boot and boot lace and on the left buttocks of his jeans. DNA testing revealed that the blood on [Petitioner's] jeans was [Archie's].

Docket Entry No. 8-5, at 6-11.

4

Apparently, Petitioner's version of the aforesaid events differed from that described above (that is, the version ensuing from the evidence proven by the State during Petitioner's trial).  Specifically, Petitioner, who testified during his trial, maintained

> that[,] at about midnight[,] he, Peter and Laura were on the front steps smoking a cigarette and talking [and] he decided to go inside to lay down.  He was inside for about ten minutes, when he heard "screaming and crying" coming from the front of the house.  He looked outside and saw Laura asking her sister what was wrong.  [Petitioner] heard Ana tell Laura that [Archie] had hit her.
>
> Initially, [Archie] was in the car, but then he got out and told Laura to "get my f***n' kids."  [Archie] then "got in [Peter's] face" and demanded that Peter get the "kids before I f*** you up."  [Petitioner] claimed that Peter began to back away from [Archie], and that [Archie] took a swing at Peter.  Before [Archie] could hit Peter, however, [Petitioner] came to his brother's defense and hit [Archie].  Then he and Peter began hitting [Archie] together.
>
> Supposedly, Ana interceded in the fight and [Archie] got up and started moving toward his car.  As he did, he said, "I'll be back, Pete.  I'm gonna get you, Pete.  I'll be back."  He then got in his car and drove off.  [Petitioner] said that he and his brother were both "nervous," and that he thought [Archie] was "angry" and was going to come back and start more trouble. . . .
>
> [Petitioner] said that[,] when [Archie] telephoned the house a short time later, he heard Laura tell Peter that [Archie] wanted to apologize to him.  His brother refused to talk with [Archie], even though [Petitioner] urged him to do so.  [Petitioner] said that Laura told Peter that [Archie] "was calling him little Pete because he [Archie] was still standing."  Defendant also said that when [Archie's] brother, Spud, called the house, he overheard an argument between Spud and Laura.  According to [Petitioner], after overhearing these two phone calls, he was "nervous and afraid."
>
> While he and Peter were in the kitchen, Peter handed him a knife saying that [Archie] might come back "with some guys."  [Petitioner] grabbed the knife, put it in his back pocket and "just left it there."  At that point, Peter called their cousin David who lived nearby, to come over.  Ten minutes elapsed and David was still not there so [Petitioner] called to tell them to "hurry up."  [Petitioner] stated he "didn't want problems," that he was " confused" and "didn't know what to expect," and, because he was "afraid," he just wanted to leave the house.
>
> [Archie] then arrived at the house before David and his brother Andrew.  [Petitioner] and Peter were in the backyard smoking a cigarette.  He heard Laura

5

"screaming" and he knew [Archie] was back. [Petitioner] told Peter to go to the side of the house to investigate. At this point, [Petitioner's] cousins arrived. While [Petitioner] and Peter were talking to David and Andrew, they heard Laura scream again. [Petitioner] looked up, saw Laura "take a swing at [Archie]," and heard [Archie] screaming something inaudible at Laura. Peter ran towards the house and pushed [Archie] with his arms. [Archie] and Peter began fighting again. Peter ran to the side of the house, while [Archie] ran behind him. [Petitioner] also ran to the side of the house. When he got there, he saw [Archie] on top of Peter hitting him. Laura was trying to get [Archie] off Peter who was "dazed" and not fighting back. [Petitioner] started hitting [Archie] "with all [his] strength on the side of his back." [Petitioner] thought he was "hurting" [Archie], but [Archie] had no reaction to the blows. [Petitioner] was beating [Archie] to get him off Peter; "I thought he was going to kill my brother."

At some point, [Petitioner] said he took the knife out of his back pocket with the intent to "poke" [Archie] with it. Just as he was about to "poke" him, however, [Archie] "reared up" and "backed into the knife." [Petitioner] knew that [Archie] had been hurt by the knife, but instead of reacting to the wound, [Archie] kept beating Peter. This was when [Petitioner] intentionally "poked" the victim in the back with the knife, but [Archie] did not stop, so [Petitioner] "poked" him a second time. This time, [Archie] "slowed down from swinging on" Peter, and [Petitioner] "backed away from him." Peter then began "crawling backwards" and Andrew helped him up from the ground.

[Petitioner] went into the house and threw the knife into the kitchen sink. He did not wipe it off, rinse it or hide it in any way. [Petitioner] went outside and got in his cousin's car, and left with his brother and two cousins. During the ride to their cousin Vanessa Gonzalez' home in Atlantic City, [Petitioner] told the others that [Archie] "backed into the knife" and then [Petitioner] "jigged him," meaning that he had "stabbed [or] poked" [Archie] with the knife.

Once at Vanessa's, Peter and the cousins said they were going back to the scene of the altercation. [Petitioner] asked [Peter] to stay with him. [Petitioner] claimed he "just didn't feel like going back" because he did not want any more problems. After they left, [Petitioner] told Vanessa what happened and he said he was "probably going to go back to New York." Later, [Petitioner] went to bed until awakened by police.

Id. at 11-14. In sum, the best this Court can surmise, Petitioner's trial was largely a credibility

contest, with the jurors weighing on both versions of events in light of the evidence proffered.

**B.** **_Miranda_ Ruling**

A certain procedural development occurring prior Petitioner's trial. Specifically,

[Petitioner's trial judge] held a <u>Miranda</u> hearing to determine if [Petitioner's] taped statement was admissible.  The only witness at the hearing was Investigator Larry Wade of the Atlantic County Prosecutor's Office.  Wade arrived at Laura's house while [Archie's] body was still there.  After discussions with [other] officers on the scene, Wade learned that the prime suspect in [Archie's] stabbing was [Petitioner], who might be at the home of his cousin, Vanessa Gonzalez, in Atlantic City.  Wade testified that[,] when he and Detective Rocky Melendez took [Petitioner] out of Vanessa's house[,] Wade did not advise [Petitioner] he was under arrest or advise him of his constitutional rights.  During the fifteen- minute ride to the Pleasantville police station neither Melendez nor Wade asked [Petitioner] any questions.

When they got to the police station Wade advised [Petitioner] of his rights and had him sign a <u>Miranda</u> card.  Wade admitted at the pretrial hearing that he did not notice that [Petitioner] refrained from checking either the "yes" or "no" box next to the question "Do you desire to waive these rights and answer questions?"  Wade testified that [Petitioner] had orally waived his rights before that time.  Wade [admitted] that [the fact that Petitioner] did not check off the box . . . was [indicative of] an oversight on Wade's part.

According to Wade's testimony, which [Petitioner's trial judge] found credible, [Petitioner] wanted to waive his rights but struggled with the idea of giving a taped formal statement to the police.  [Petitioner's trial judge] found especially significant [Petitioner's] statement, "I'm gonna talk, but you got to give me time."  [The judge] drew a distinction . . . between [Petitioner's] willingness to waive his right to remain silent and his willingness to give a taped formal statement.  . . . [W]hen a new tape was procured, [Petitioner] himself, as he admitted during his testimony, was the one who initiated the taping without Wade even having a chance to go through certain formalities of taping.  [Petitioner] himself turned on the recorder.  When Wade asked [Petitioner] if he was giving a statement voluntarily, [Petitioner] interrupted him in order to start telling his version of events.  During his testimony[, Petitioner] agreed that he was the one to initiate taping on the final tape on which he gave a statement.

<u>Id.</u> at 16-17.

## C.   <u>Outcomes of Petitioner's Trial, Direct Appeal and PCR Proceedings</u>

In sum,

[t]he [key] issue [decided during Petitioner's trial] was not whether [Petitioner] inflicted the stab wounds [that caused Archie's death, since no party, Petitioner included, disputed that aspect] but why he did so.  [Petitioner, basically,] claimed

> he stabbed [Archie] in self-defense or in defense of [Peter. The State's position was that Petitioner acted on offensive.]

Id. at 5. The jurors, apparently, found the State's position more credible in the sense of being

more in line with the evidence offered during the trial. Correspondingly, after Petitioner

> was tried before a jury[, he was] convicted of murder . . . , third degree possession of a knife for an unlawful purpose . . . , and fourth degree unlawful possession of a knife . . . . After merging the two lesser offenses with the murder charge, [his trial] court sentenced [him] to a term of life imprisonment on the murder conviction, subject to an eighty-five percent period of parole ineligibility under the No Early Release Act . . . . At the conclusion of the sentencing hearing, the court found [Petitioner's] comments at sentencing contemptuous and sentenced him to a consecutive term of six months. On direct appeal, [the Appellate Division] affirmed [Petitioner's] conviction, but vacated the NERA parole disqualifier . . . . The Supreme Court denied [Petitioner's application] for certification.

> [Petitioner] filed a timely PCR petition. By order dated July 10, 2006, the trial court denied [that application]. Responding to [Petitioner's PCR] appeal, [the Appellate Division] rejected [Petitioner's] arguments substantially for the reasons expressed by [the trial court]. Nevertheless, mindful of [certain state case law and state rules, the Appellate Division] reverse[d] the order denying the PCR petition because [Petitioner] alleged that his PCR counsel "failed to advance grounds for post-conviction relief that [Petitioner] insisted [upon]." Because the record before [the Appellate Division] at the time did not permit [it] to definitively determine whether PCR counsel had ignored [Petitioner's] requests to present his arguments, [the Appellate Division, out of abundance of caution,] "remanded the case to the trial court to determine whether there was such a violation [with a directive to] assign new [PCR] counsel to represent [Petitioner] and conduct a new hearing in conformity with [state law].

> On remand, after assigning new counsel to defendant, [the trial court] considered all of the arguments presented by that counsel, including the arguments not raised by [Petitioner's] original PCR counsel. [The trial court] rejected these arguments and again denied [Petitioner] PCR [relief. The Appellate Division affirmed, and the Supreme Court of New Jersey denied Petitioner certification.]

State v. Sierra, 2010 WL 3257965, at *1 (N.J. Super. Ct. App. Div. Aug. 18, 2010).

The Petition at bar followed, raising eight Grounds[2] that were litigated during Petitioner's direct appellate and post-conviction relief ("PCR") proceedings.  See Docket Entries Nos. 1, 3.

## II.   PETITIONER'S INSTANT CHALLENGES

Specifically, Petitioner asserted the following Grounds for relief:

Ground I:      THE POLICE DID NOT SCRUPULOUSLY HONOR PETITIONER'S RIGHT TO REMAIN SILENT AND STATE COURT'S FAILURE TO SUP[P]RESS HIS STATEMENT [WAS] A VIOLATION OF THE HIS FIFTH AND FOURTEENTH AMENDMENT RIGHTS . . . .

Ground II:     THE STATE'S SUP[P]RESSION OF FAVORABLE EVIDENCE PERTAINING TO PETITIONER' S MENTAL STATE IS A VIOLATION OF THE RULES OF DISCOVERY AND THEREBY DENIED PETITIONER'S RIGHT TO A FAIR TRIAL . . . UNDER BRADY V. MARYLAND.

Ground III:    NUMEROUS INSTANCES OF PROSECUTORIAL MISCONDUCT DEPRIVED PETITIONER OF HIS DUE PROCESS RIGHT TO A FAIR TRIAL . . . UNDER BERGER V. UNITED STATES.

Ground IV:     THE PROSECUTOR'S IMPROPER ATTEMPT TO INFLAME THE JURY BY SOLICITING SYMPATHY FOR THE VICTIM AND HIS FAMILY DEPRIVED THE PETITIONER OF HIS DUE PROCESS RIGHT TO A FAIR TRIAL.

Ground V:      THE TRIAL COURT' S FAILURE TO EXPLAIN THE SIGNIFICANCE OF IMPERFECT SELF-DEFENSE THWARTED THE JURY'S CONSIDERATION OF THE RELEVANT LESSER-INCLUDED OFFENSES . . . .

Ground VI:     THE TRIAL COURT'S FAILURE TO INSTRUCT THE JURY SUA SPONTE NOT TO DRAW AN ADVERSE INFERENCE FROM THE FACT THAT PETITIONER'S BROTHER, PETER SIERRA, AND HIS COUSIN, ANDREW GONZALEZ, WERE NOT CALLED AS WITNESSES TO TESTIFY ABOUT THEIR INVOLVEMENT IN THE

---

[2]  As the factual predicates asserted in the Petition and the state courts' record indicate, Petitioner's Eight Grounds consist of many sub-grounds, but these sub-grounds were grouped by the state courts in coherent clusters of challenges, and the Petition at bar followed the same format.  Correspondingly, this Court examines the Petition in the same fashion.

STABBING . . . DEPRIVED PETITIONER OF HIS . . . RIGHT[] TO PRESENT A DEFENSE . . . .

Ground VII:   TRIAL COUNSEL'S FAILURE TO INTERVIEW AND CALL EXCULPATORY DEFENSE WITNESSES DENIED [PETITIONER] HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL . . . UNDER STRICKLAND V. WASHINGTON.

Ground VIII   TRIAL COUNSEL'S FAILURE TO REMOVE A JUROR WHO HAS A MEDICAL CONDITION AND OBJECT TO CONDITIONS THAT OBSTRUCTED THE JURY'S ABILITY TO FOCUS, DEPRIVED PETITIONER OF EFFECTIVE ASSISTANCE OF COUNSEL . . . UNDER STRICKLAND V. WASHINGTON.

Docket Entry No. 3-1, at 2-4.

## III.   STANDARD OF REVIEW

Section 2254(a) of Title 28 of the United States Code gives the court jurisdiction to entertain a habeas petition challenging a state conviction or sentence only where the inmate's custody violates federal law:

> [A] district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a).

"In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); 28 U.S.C. § 2254(a); accord Barry v. Bergen County Probation Dept., 128 F.3d 152, 159 (3d Cir. 1997). "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." Smith v. Phillips, 455 U.S. 209, 221 (1982). "If a state prisoner alleges no deprivation of a federal right, § 2254 is simply inapplicable. It is unnecessary in such a situation to inquire whether the prisoner

10

preserved his claim before the state courts."  Engle v. Isaac, 456 U.S. 107, 120 n.19 (1982).

"[E]rrors of state law cannot be repackaged as federal errors simply by citing the Due Process

Clause."  Johnson v. Rosemeyer, 117 F.3d 104, 110 (3d Cir. 1997).  Moreover, "it is well

established that a state court's misapplication of its own law does not generally raise a

constitutional claim."  Smith v. Horn, 120 F.3d 400, 414 (3d Cir. 1997) (citation  omitted); see

also Smith v. Zimmerman, 768 F.2d 69, 71, 73 (3d Cir. 1985).

A district court must give deference to determinations of state courts.  Duncan v. Morton,

256 F.3d 189, 196 (3d Cir.), cert. denied, 534 U.S. 919 (2001); Dickerson v. Vaughn, 90 F.3d 87,

90 (3d Cir. 1996).  Federal courts "must presume that the factual findings of both state trial and

appellate courts are correct, a presumption that can only be overcome on the basis of clear and

convincing evidence to the contrary."  Stevens v. Delaware Correctional Center, 295 F.3d 361,

368 (3d Cir. 2002).  Where a federal claim was "adjudicated on the merits" in state court

proceedings, § 2254 does not permit habeas relief unless adjudication of the claim

> (1)     resulted in a decision that was contrary to, or involved an unreasonable
>         application of, clearly established Federal Law, as determined by the
>         Supreme Court of the United States; or
>
> (2)     resulted in a decision that was based on an unreasonable determination of
>         the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).[3]

---

[3] "An 'adjudication on the merits' has a well settled meaning: a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground."  Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001).  A state court may render an adjudication or decision on the merits of a federal claim by rejecting the claim without any discussion whatsoever.

A decision is "'contrary to' a Supreme Court holding if the state court 'contradicts the governing law set forth in [the Supreme Court's] cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of th[e Supreme] Court and nevertheless arrives at a [different] result." Williams v. Taylor, 529 U.S. 362, 405-06 (2000). Under the "'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. Whether a state court's application of federal law is "unreasonable" must be judged objectively; an application may be incorrect, but still not unreasonable. Id. at 409-10. A court begins the analysis by determining the relevant clearly established law. See Yarborough v. Alvarado, 541 U.S. 652, 660 (2004). Clearly established law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412.

## IV.   DISCUSSION

### A.   GROUND ONE

Petitioner's Ground One focuses on his pre-trial Miranda hearing. While Petitioner's discussion of this issue is rather lengthy, it effectively boils down to Petitioner's claims that his taped confession should have been suppressed because Petitioner now: (a) speculates that Officer Wade must have been habitually procrastinating in giving Miranda warning to all persons detained until taking them in custody formally (Petitioner opines that such procrastination must have been intentional and conducted by Officer Wade in the hope that detainees might volunteer inculpatory statements) and, upon taking these detainees in formal custody, Officer Wade must have been persistently and aggressively encouraged all detainees to make inculpatory

12

confessions; (b) believes that Officer Wade unduly employed these practices with regard to

Petitioner, causing Petitioner to render  self-incriminating, inculpatory statements that Officer

Wade tape-recorded; (c) believes that the time span between the Miranda warning given to him

by Officer Wade and the point in time when Petitioner's confession was taped, being 89 minutes

(i.e., a minute short of an hour and a half), must have been unduly long (from this conclusion,

Petitioner deduces his next conclusion, i.e., that this time span must have rendered Petitioner's

confession inadmissible under Miranda); and (d) Petitioner's few initial statements s reluctance

had to negate and render inadmissible his lengthy, detailed and ardently delivered confession he

audio-taped less than an hour and a half later (in other words, Petitioner maintains that, if he

changed his mind about confessing/talking altogether, he had to be re-administered another

Miranda warning right at the moment when he changed his might).[4]  See Docket Entry No. 3-1,

at 7-9; accord Docket Entry No. 11.

The Fifth Amendment provides, in part, that no person "shall be compelled in any

criminal case to be a witness against himself."  U.S. Const. amend. V.  The Fourteenth

Amendment incorporates the Fifth Amendment privilege against self-incrimination.  See Malloy

v. Hogan, 378 U.S. 1, 8 (1964).  In Miranda v. Arizona, 384 U.S. 436 (1966), the Court held that

"without proper safeguards the process of in-custody interrogation . . . contains inherently

---

[4]  The record shows that, at the outset of being questioned by Officer Wade, Petitioner
denied any involvement in Archie's murder.  However, his next set of statements included
statements establishing that he was present at the scene of the crime and partook in altercations,
although – for a brief while – he still kept denying any "poking" of Archie with a knife.  By the
time he progressed to his taped confession, he produced a multitude of statements leaving no
doubt that he was the person who inflicted all three wounds suffered by Archie (although these
statements included his position that he acted in fear for his and Peter's lives).  Petitioner's trial
testimony was aligned with the statements made during his taped confession.

compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." Id. at 467.  In other words, there is no doubt that, when police ask questions of a suspect in custody, and that suspect was *never* administered the required warning, Miranda dictates that self-incriminating, inculpatory statements made by the suspect are presumed compelled and they are excluded from evidence at trial in the State's case in chief.  See Oregon v. Elstad, 470 U.S. 298, 317 (1985).  Hence, a confession taken during a custodial interrogation without any Miranda warning facially violates the privilege against self-incrimination.  See Thompson v. Keohane, 516 U.S. 99 (1995).

Conversely, a waiver of the right to remain silent renders self-incriminating, inculpatory statements admissible, and such waiver may be made orally, in writing or even implied by the interrogated person's conduct.  See North Carolina v. Butler, 441 U.S. 369, 373 (1979); United States v. Cruz, 910 F.2d 1072, 1080 (3d Cir. 1990), cert. denied, 498 U.S. 1039 (1991).  Correspondingly, a trial court can properly admit a defendant's self-incriminating, inculpatory custodial statements if the court finds that the government met its preponderance-of-the-evidence burden of showing that the statements were made with a valid oral, written or manifested-by-conduct waiver.[5]  See Colorado v. Connelly, 479 U.S. 157, 168-69 (1986).

The question of whether the waiver at issue was "valid" is, invariably, resolved on a case-by-case basis.  This is so because, under Miranda, a waiver is valid if it is made

---

[5]  A determination as to constitutional legality or procedural propriety of the underlying arrest is not dispositive for the purposes of admissibility-of-evidence analysis.  Cf. Brown v. Illinois, 422 U.S. 590 (1975).  In Brown, the Supreme Court held that even a confession obtained through custodial interrogation following an *illegal* arrest might be spared from suppression if an intervening event breaks the causal connection between that illegal arrest and the confession, i.e., if it is clear that the confession is "sufficiently an act of free will."  Id. at 602.

14

"voluntarily, knowingly and intelligently."  Miranda, 384 U.S. at 475.  In determining whether there has been a valid waiver of Miranda rights, a court must conduct a two-part inquiry ensuing from the "totality of the circumstances" test.  See Moran v. Burbine, 475 U.S. 412, 421 (1986).  First, the court looks to the voluntariness of the waiver statement (or of the implied waiver, that is, if the waiver ensued from the suspect's conduct, which conduct might be the suspect's very rendition of the self-incriminating, inculpatory statement at issue) in order to determine whether the waiver was made "freely," as opposed to being obtained by coercion.  See id.  Second, the court must consider whether the waiver statement (or the implied waiver, if the waiver ensued from the suspect's conduct) was made "knowingly and intelligently," in the sense that the accused was fully aware "both of the nature of the right being abandoned and the consequences of the decision to abandon it."  Id.

In conducting the aforesaid analysis, the court must take into account "both the characteristics of the accused and the details of the interrogation," Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973), by evaluating the subject's age, education, experience, background, and intelligence, as well as the capacity to understand the warnings given, the length of detention, the nature of questioning, the use of physical punishment, if any (such as prolonged deprivation of food, water, sleep, access to toilet facilities).  See id.; see also Fare v. Michael C., 442 U.S. 707, 725 (1979); United States v. Swint, 15 F.3d 286, 289 (3d Cir. 1994).  In addition, the "totality of circumstances" approach directs the court to be mindful of the subject's familiarity with the criminal justice system, the timing of the Miranda warnings and the statement given.. See United States v. Velasquez, 885 F.2d 1076, 1086 (3d Cir. 1989), cert. denied, 494 U.S. 1017 (1990); see also Yarborough v. Alvarado, 541 U.S. 652 (2004).

15

Here, the totality of circumstances weighs against Petitioner.  The time span of Petitioner's detention, by the time he gave his confession, was short, as was the time span between the <u>Miranda</u> warning and his confession (an hour and twenty-nine minutes).[6]  <u>See</u>, <u>e.g.</u>, <u>Hall v. Thomas</u>, 611 F.3d 1259 (11th Cir. 2010) (affirming dismissal of <u>Miranda</u> challenges raised by a *juvenile* whose waiver was entered at 5:44 p.m. and taped confession was obtained at 7:06 p.m., <u>i.e.</u>, an hour and twenty-two minutes later).  Moreover, contrary to Petitioner's self-serving beliefs, the methods employed by Officer Wade in obtaining Petitioner's confession were entirely legitimate.[7]  In the same vein, Petitioner's initial few statements expressing

---

[6]  The record shows that the police learned of Petitioner's whereabouts at about 2:30 a.m., when policemen stopped the car in which Peter, Andrew Gonzalez and David Gonzalez were.  That stop occurred in Egg Harbor Township, and the officers learned that Petitioner was at Vanessa Gonzalez's house, in Atlantic City.  Following their ride from Egg Harbor Township to Atlantic City, officers had to first wait for Vanessa to open the door, then spent considerable time peacefully negotiating Petitioner out of the bed (presumably, in order to protect the safety and mental well-being of the small children who were sleeping in the same bed as Petitioner), and then transport Petitioner to police headquarters (during the ride, Petitioner was neither questioned nor taken into formal custody).  While Petitioner maintains that the hour and a half time span preceding his taped confession was unduly lengthy, a less-than-ninety-minute time span did not erase Petitioner's memory or understanding of his <u>Miranda</u> rights.

[7]  Petitioner, seemingly, tries to put emphasis on Officer Wade's alleged "trickery" practices ensuing from Petitioner's assertions that he was not questioned immediately but, when he began being questioned, Officer Wade was persistent and aggressively encouraged Petitioner to state Petitioner's version of events.  Petitioner's position is without legal support.  The Supreme Court has stated that "<u>Miranda</u> forbids coercion, not mere strategic deception."  <u>Illinois v. Perkins</u>, 496 U.S. 292, 297 (1990); <u>accord</u> <u>United States v. Holmes</u>, 44 F.3d 1150 (2d Cir. 1995) (relying on <u>Illinois v. Perkins</u> in rejecting defendant's challenge to government's use of a third-party to tape record incriminating conversations).  Since "strategic deception" allowed by <u>Miranda</u> includes "[p]loys to mislead a suspect or lull him into a false sense of security," it is self-evident that aggressive encouragement to state one's version of events or persistent questioning cannot "rise to the level of compulsion or coercion [barred by] <u>Miranda</u>."  <u>Perkins</u>, 496 U.S. at 297.

reluctance to confess or to talk altogether[8] did not render his inculpatory statements supplied shortly thereafter coerced: the record unambiguously indicates that Petitioner changed his mind about continuous silence since, "when a new tape was procured, [Petitioner] himself, as he admitted during his testimony, . . . initiated the taping without Wade even having a chance to go through certain formalities of taping. [Petitioner] himself turned on the recorder. When Wade asked [Petitioner] if he was giving a statement voluntarily, [Petitioner] interrupted him in order to start telling his version of events." Docket Entry No. 8-5, at 17 (basing this factual finding on the trial transcript). In addition, Petitioner's claim of his alleged overall mental instability (which, according to Petitioner, prompted him to attempt suicide on the day following the evening of Archie's murder) cannot establish, or even suggest, Petitioner's lack of mental capacity *at the time of his confession*. Cf. Medeiros v. Shimoda, 889 F.2d 819, 823 (9th Cir. 1989) ("A confession is voluntary if it is "'the product of a rational intellect and a free will'" regardless of whether "'a confession is the production of . . . a drug-alcohol-induced state'") (citing Townsend v. Sain, 372 U.S. 293 (1963), brackets removed).[9]

---

[8] Importantly, Petitioner's initial utterance (expressing reluctance to make a statement) at no point included a request for counsel to be present.

[9] To add, Petitioner's attack on Respondents' answer to his Miranda challenges misses the mark. See Docket Entry No. 11, at 4 (Petitioner's traverse offered the Court only a single statement directly related to Respondents' answer, which made a mentioning of Berghuis v. Thompkins, 130 S. Ct. 2250 (2010)). Respondents' reference to Thompkins supplies support to their position. In Thompkins, the Supreme Court held that "an accused who wants to invoke his or her right to remain silent [must] do so *unambiguously*." Id. at 2260 (emphasis supplied). In Thompkins, the defendant, after receiving Miranda warnings, remained largely silent during an interrogation that lasted approximately three hours. See id. at 2256. About two hours and 45 minutes into that interrogation, however, Thompkins made inculpatory statements. See id. at 2257. Prior to trial, he moved to suppress those statements, arguing "that he had invoked his Fifth Amendment right to remain silent [by initially] requiring the police to end the interrogation

(continued...)

Finally,  Petitioner did not and cannot show that the admission of his confession "had a substantial and injurious effect or influence in determining the jury's verdict," Brecht v. Abrahamson, 507 U.S. 619, 637 (1993), since: (a) Petitioner repeated his confession, virtually verbatim, to the jurors when Petitioner testified during his trial; (b) Petitioner's entire defense/theory-of-the-case was squarely based on Petitioner's testimony repeating his confession"; and (c) at no point did Petitioner assert that he would not have testified at trial had he had his confession deemed inadmissible or that his testimony could have been substantively different from the one he gave during the trial.  See United States v. Havens, 446 U.S. 620, 626 (1980) (regardless of how a witness arrives at the stand, that person is under the obligation to "testify truthfully"); accord Oregon v. Hass, 420 U.S. 714, 722 (1975) (even if a defendant takes the stand involuntarily, "the shield provided by Miranda [should] not to be perverted to a license to testify inconsistently, [moreover] perjuriously").

---

⁹(...continued)
at once."  Id.  The trial court denied that motion and Thompkins was subsequently convicted, and that conviction was affirmed on direct appeal.  See id. at 2257-58.  After he filed a habeas petition, the district court denied relief, but the United States Court of Appeals for the Sixth Circuit reversed, holding "that the state court was unreasonable in finding an implied waiver" from Thompkins' making inculpatory statements, since these statements followed his request "to end the interrogation at once."  Id. at 2258.  The Supreme Court reversed the Sixth Circuit holding that Thompkins waived his right to remain silent by his subsequent inculpatory statements, and so such statements were properly admitted at trial.  See id. at 2260-64.  Here, Respondents, relying on Thompkins, merely point to: (a) insignificance of Petitioner's failure to mark the "yes" or "no" box on the card, since such failure could not signal an unambiguous refusal to make a statement; and (b) and implied waiver ensuing from Petitioner's  audio-taped confession submitted in a fashion effectively preventing Wade from re-administering Miranda. Docket Entry No. 8-5, at 17 ("When Wade [tried to re-ask Petitioner] if he was giving a statement voluntarily, [Petitioner] interrupted him in order to start telling his version of events").

18

In light of the foregoing, the state courts' determination that introduction of Petitioner's confession into evidence did not violate his right to fair trial was not an unreasonable application of the governing Supreme Court precedent. Correspondingly, Petitioner's Ground One does not warrant habeas relief.

### B.    GROUND TWO

In his Ground Two, Petitioner asserts that: (a) on the morning following Archie's murder, Petitioner allegedly attempted a suicide; (b) Petitioner was transported to a medical facility where he denied the fact of attempting suicide; (c) the medical personnel allegedly observed certain unspecified marks and certain untested dry blood on Petitioner's neck; (d) Petitioner allegedly attempted to commit another suicide, that time by cutting his wrists, *two years prior* to Archie's murder (that is, when Petitioner was 23 years old); (e) *nine years prior* to Archie's murder (that is, when Petitioner was 16 years old), Petitioner was allegedly treated by a psychiatrist and medical doctor(s) after being, allegedly, first robbed and assaulted by certain men and then suffering shots to his head, chest, torso and limb; (f) *fourteen years prior* to Archie's murder (that is, when Petitioner was 11 years old), Petitioner was allegedly treated by medical doctor(s) after being, allegedly, shot in his head, chest and limb; (g) visited in the medical facility by police offices investigating Archie's murder, Petitioner allegedly stated to at least one of these officers that Petitioner was "treated for mental problems and had been shot in the head in the past" but that policeman, apparently, did not include that tidbit of information in his report as to investigation of Archie's murder; (e) Petitioner concedes that the record has no showing that his prosecutor had any information about Petitioner's alleged suicide (which allegedly took place on the morning following Archie's murder) or about the events that took

place two, nine or fourteen years prior to Archie's murder; (f) Petitioner's defense counsel learned of the suicide attempt (which allegedly took place on the morning following Archie's murder) after the trial but prior to sentencing and moved the state court for a new trial claiming that, had the defense counsel knew of Petitioner's mental problems, he might have considered trying to mount a lack-of-capacity defense.  See Docket Entry No. 3-1, at 8-10.  From these chain of allegations, Petitioner deduces that his rights ensuing from the holding of  Brady v. Maryland must have been violated and, in his Ground Two, seeks habeas relief under Brady. See id.

Respondents' answer indicates their uncertainty as to the logic of Petitioner's Ground Two argument.  This Court, too, has uncertainty.  The Supreme Court has held that the prosecution in a criminal proceeding has a due process obligation to disclose to the defendant its knowledge of material evidence favorable to the defendant, either because the evidence is exculpatory or because it can serve to impeach a key prosecution witness.  See Kyles v. Whitley, 514 U.S. 419, 433 (1995); Giglio v. United States, 405 U.S. 150 (1972); Brady v. Maryland, 373 U.S. 83 (1967).  Supreme Court precedent clarifies that "[t]here are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  Strickler v. Greene, 527 U.S. 263, 281-82 (1999).  "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  United States v. Bagley, 473 U.S. at 682; see also California v. Trombetta, 467 U.S.

479, 488-89 (1984) (the prosecutor's failure to retain breath samples was not unconstitutional where the chances are extremely low that preserved samples would have been exculpatory).

Denying Petitioner's <u>Brady</u> challenges under <u>Brady</u> and its state-law counterpart, the state courts pointed out that "[t]he prosecution did not keep from [Petitioner] or his family [or his defense counsel the facts of] his own [alleged] suicide attempt [or his prior mental or medical history]."  Docket Entry No. 8-5.  In tune with the state courts, Respondents here: (a) reiterate the obvious, <u>i.e.</u>, that the information allegedly "suppressed" was always available to Petitioner and his defense counsel; and (b) point out that the evidence allegedly "suppressed" was "not necessarily favorable to defense" because Petitioner's alleged suicide attempt occurred *after* Archie's murder and, being examined by psychiatrists in connection with that alleged suicide attempt, Petitioner was found well "oriented to place, time and person."  Docket Entry No. 8, at 4-5.

This Court agrees.  Petitioner's position asserted in his Ground Two is without merit because: (a) the prosecutor did not conceal anything known to the prosecution; (b) moreover, the allegedly "concealed" information was, indeed, *known* to Petitioner and *readily available* to his counsel (who could obtain this information by simply asking Petitioner or Petitioner's family members);[10] (c) the "concealed" information had no or little relevance to the issues tried (and, thus, could not qualify as material) and, in addition, its validity was exceedingly speculative because Petitioner, as he himself concedes, denied attempting any suicide after Archie's murder, his examination by psychiatrists established his full mental capacity, the marks on his neck could

---

[10]  The Court notes that Petitioner, in his Petition, concedes that he, indeed, "discussed his mental history with [his defense] counsel."  Docket Entry No. 3-1, at 22.

have been a result of the altercation (be it with Archie, Laura or Ana), and the "dried blood" allegedly detected on his neck could have been someone else's, e.g., Archie's.

In sum, Petitioner's <u>Brady</u> claim has no merit whatsoever. The state courts' dismissal of that claim was not an unreasonable application of the governing range of Supreme Court precedent, and Petitioner's Ground Two must be dismissed.

## C.    GROUNDS THREE AND FOUR

Petitioner's Grounds Three and Four seek habeas relief by asserting prosecutorial misconduct on the basis of various prosecutorial statements. The state courts observed:

> We reject [Petitioner]'s contention that he was denied a fair trial because of a pattern of misconduct by the prosecutor. [Petitioner] did not object at trial during the various incidents he complains about. Nor did he raise the issue on the motion for new trial. [Petitioner] complains that the State improperly attempted to inflame the jury. [Petitioner] cites the prosecutor's opening statement in which the prosecutor told of [Archie's] planned birthday celebration for the evening of his death. [Petitioner] claims such information tainted the proceedings. . . . We agree with the State that giving a context for the events of the evening was entirely appropriate and not simply designed to inflame the passions of the jury. During his cross-examination of [Petitioner,] the prosecutor highlighted several inconsistencies between [Petitioner's] testimony and those of eyewitnesses who had previously testified. The prosecutor then asked [Petitioner]:
>
> > Q.    Are you saying, sir, that Laura [was] lying when she came in here and told this jury that your brother got in [Archie's] face and [said, "]you messing with my girl["] or words to that effect?
> >
> > A.    Yes. She [was] lying if she stated that, yes.
> > Q.    Laura . . . is your brother's girlfriend, isn't she?
> > A.    Yes.
> > Q.    In fact, he's the father of some of her children isn't he?
> > A.    Father of her youngest daughter, Alexus.
> > Q.    There's no reason you can offer as to why Laura . . . would lie against Pedro or your brother, Peter, right?
> > A.    I wouldn't know. I don't know.
>
> . . . [We] conclude that the[se] question[s] fall[] within the ambit of proper cross-examination. . . . Here, the prosecutor asked whether Laura . . . would have a

motive to fabricate testimony implicating [Petitioner]'s brother as the aggressor in the incidents leading to [Petitioner] stabbing the victim. Asking whether a witness has a motive to lie or asking whether the witness actually lied are separate concepts and distinguishable. . . .

[Petitioner also] complains that during summation the prosecutor said "that [Petitioner] kicked [Archie] while he was down." [Petitioner] takes the comment out of context and fails to mention that the prosecutor qualified the statement as a permissible inference. The pertinent portion of the summation was as follows:

> What do the scene photographs show you? Near [Archie's] body, a woman's shoe which also we have in evidence. All of those pieces of physical evidence, members of the jury, corroborates what Ana . . . told you about the struggle and how she tried desperately to protect [Archie] from further assault. She told you that as she stood there over his body, stooped over his body trying to shield him from the attack, this [Petitioner's] brother kicked him, kicked him while he was down. I submit to you there was some kicking. There was some kicking, but one of the people who kicked [Archie] as he was down was that man, the [Petitioner]. And you know that because what you have is his right shoe that he admitted was his boot, that brown boot which Mr. Nichols said he found traces of blood on. I got to ask you something. How did that blood get there? I submit to you a permissible inference you can draw from the evidence of blood on the [Petitioner's] right shoe is that after he stuck that knife into him three times and [Archie] lay on the ground bleeding to death, he gave him a few kicks.

[Petitioner's] own statement related that when [Petitioner] and Peter fought with [Archie] the second time "we w[ere] kicking him" and [Petitioner] stated that this was when [Archie] somehow backed into [Petitioner's] knife. Because the medical evidence showed that there was blood on [Petitioner's] boot and [Archie] suffered two broken ribs, the prosecutor told the jury that a "permissible inference" was that [Petitioner] kicked [Archie] when he was no longer able to fight – that is[,] after the stabbing. . . . The prosecutor's statement here is . . . supported by the record. Prosecutors must vigorously represent the interests of the State and their conduct is not grounds for reversal "unless the conduct was so egregious that it deprived [Petitioner] of a fair trial." Because the prosecutor's statement was a reasonable inference from the evidence, . . . we cannot conclude the prosecutor's statement deprived [Petitioner] of a fair trial.

[Petitioner] also complains that this portion of the prosecutor's summation was not supported by the record:

> You heard Laura['s] . . . testimony, a witness, I submit who has no ax to grind; who simply got caught in the middle of this, during the course of that altercation that I submit to you by [Archie] to protect himself from Pedro Sierra's attack, he went limp.  That's the way she described it.  He went limp.  And he went limp, members of the jury, because as you heard Dr. Gross testify, that knife entered through his well-nourished muscular physique, penetrated the cartilage of his ribs, went through his lung and nicked the myocardium, the muscle around his heart.  Dr. Cross testified that no, there were no hilt marks.  The defense in this case, I submit to you, has tried to minimize the depth of those wounds by saying that Dr. Cross estimated to be as little as three inches.  But if you recall Dr. Grosses testimony, he went three inches the other way, too.  He said it <u>could have penetrated to a depth up to nine inches which conveniently is the size of that knife blade because you saw Dr. Gross measure it, but he wasn't able to tell because he couldn't tell whether [Archie's] lung was expanded, inflated or deflated at the time.  So when they tell you, oh, it was just a little poke, a little poke, it could only go in three inches, it could have been a violent stab wound that went into a depth of at least nine inches.</u>

[Petitioner] . . . quotes the underlined portion of the summation which is distorted and taken out of context.  In fact, Dr. Gross said that he measured the non-superficial wounds' depths at between five and six inches but that was an estimate because there was no fixed landmark in the path of the wounds and it was difficult to determine at what point the victim was in an inhalation/exhalation cycle which may have affected the measurement of knife-blade penetration. During the same cross-examination defense counsel made much of the fact that there was no hilt mark.  Dr. Gross testified that the absence of a hilt mark was not determinative since the victim was stabbed through clothing. Given the context in which the prosecutor placed his remark, . . . and the overall impression left with the jury, as well as the full testimony of Dr. Gross, the prosecutor did not make an impermissible argument.  Moreover, because [Petitioner] consistently stated that he only "poked' [Petitioner] in an effort to disable him, the fact that the knife could have penetrated the victim to its full length was an appropriate comment during summation and was at least arguably supported by the record.

[Petitioner] also complains about this statement, during closing, when the prosecutor commented on the combination of cocaine and alcohol in [Archie's] blood:

> Dr. Siek didn't know anything until, if you remember, when he was on the witness stand on my cross-examination[,] I approached him with a hypothetical which[,] if you were paying attention[,] included all the facts that had been testified thus far to in the case, [and] Dr. Siek said, and I

> don't dispute this, because cocaine is a stimulant, everyone knows that; everyone knows alcohol is a depressant, which I submit to you will probably cause a Plato effect in a person who has both those substances in their body.

In regard to this comment, we do not know what the prosecutor meant by a "Plato effect." There is no reference to such an effect in either Merriam Webster or Stedman's Medical Dictionary. One could infer from the context that the potential physiologic effects of cocaine and alcohol would negate each other, but the prosecutor did not make such a statement. Moreover, given the extensive testimony by the defense expert, which attempted to portray the victim as someone who was so "out-of-it" on cocaine that he felt invincible, this lone remark by the prosecutor within the context of a closing statement was not so egregious as to deprive [Petitioner] of a fair trial. . . .

[Petitioner] next asserts that the prosecutor's statement that fear does not satisfy the passion element of passion-provocation manslaughter was a misstatement of the law. . . . [Petitioner] misapprehends the prosecutor's statement or takes it out of context. In his closing the prosecutor here told the jury to "[l]isten to the Judge's definitions. He'll tell you exactly what the law is" and then went on to list the four factors that distinguish passion-provocation manslaughter from murder. The prosecutor then argued, using the testimony adduced from [Petitioner] at trial, that [Petitioner] had not been provoked and that [Petitioner] had not been impassioned by the fight, which was consistent with [Petitioner's] testimony at trial. Further, the prosecutor actually argued that [Petitioner] may have satisfied the first element of passion-provocation when during the closing he said "[f]ear . . . does prove the first element of passion-provocation." This type of argument was entirely appropriate. . . . [Petitioner]'s argument is without merit.

During summation the prosecutor argued that[,] when Wade and [Petitioner] got to the police station,

> the first words out of [Petitioner's] mouth [were], I had nothing to do with this. Deny it. Well, you know from his testimony denial is not just a river in Egypt. He denies, he denies completely being involved in this. This is a guy who had nothing to worry about, who done nothing wrong. Only acted in self-defense, he denies that he had ever had anything to do with it. He said – all right, now they talk to him a little more because they can. There was nothing inappropriate. He was advised of his constitutional rights. He indicated that he fully understood those rights, and then as his story progressed a little further down the road, he says, "Yeah, I was there, but I just kicked him. I was there, but I just kicked him. So we go from denial – that Wade must really be a sneaky guy – goes from denial to saying, "all I did was kick him" I was there, but I just kicked him; to

25

finally, finally after being told [Archie] is dead, admitting, admitting that he was there that – not that he jugged him; he said he backed onto the knife.  Okay.  The defense claim was that, that was the [Petitioner's] idea the whole thing about [Archie] backing up to the knife.  Wade, a person who I submit to you had absolute no motive to lie in this case or fabricate any of his testimony – and by the way, coincidentally, his testimony with regard to what happened during the questioning parroted – was parroted by Detective Melendez who the defense has told you was an honest, straightforward guy, and he says [Petitioner] was all full of tears and teary eyes, and he said, "Oh my life is over."

In light of the [state] case law, a statement by the prosecutor commenting on the veracity of a police witness can be problematic.  . . .  However, [even under the state law,] this lone remark of this prosecutor [is] distinguish[able] . . . from those which . . . found troubling in [state law] cases.  . . .  In the case before us, during summation[,] defense counsel characterized Wade as follows:

> So I'm not saying that as an indictment against Investigator Wade.  He was an advocate and that's the light in which his testimony has to be taken that he was trying to win the case from day one.  From that very moment he was trying to win the case from day one.
>
> [Petitioner] said that the wounds that were inflicted were inflicted intentionally.  He intended, not the extent of the wounds, not the result of the wounds, but he intended to use the knife.  And again, we heard from Investigator Wade.  We heard Investigator Wade say, and again Wade was an advocate.  He was trying to make the case and I submit to you that it was [Petitioner] who told him that [Archie] reared up and backed into the knife initially.  You know that Investigator Wade recalls it, it was his idea, that it was his idea, but the facts, the evidence shows otherwise.

In our view, a single remark by the prosecution that Wade had no motive to lie was an appropriate response to [Petitioner's] "opening salvo" in characterizing Wade's testimony as advocacy in favor of the State, [see] United States v. Young, 470 U.S. 1, 12 (1985).

[Petitioner] also complains that the prosecutor disparaged defense counsel during summation with the following passage:

> [Petitioner's] testimony, I submit to you[,] when it came from this witness stand, was rehearsed.  And I don't throw that out there not being able to point to a transcript. . . . Defense counsel asked him on direct examination, "He reared up and backed into the knife?"  Yes, sir.  Now, this is the very next question, "That idea did not come from" – without that question

26

> being finished the [Petitioner] answers, "No, sir."  And defense counsel
> finishes the question with Investigator Wade, and he says, "No, sir."
> Smart guy answers questions before they're even asked.

> [Petitioner] complains that this argument implied that "defense counsel aided
> [Petitioner] in fabricating his testimony."  Our reading of the passage reveals no
> such implication.  We conclude the prosecutor was merely suggesting that
> [Petitioner] rehearsed his testimony.  Such comments are appropriate in closing
> argument.  We distinguish this comment from comments where prosecutors
> implied that the very fact [Petitioner] had sought advice of counsel implied guilt,
> as cases cited in [Petitioner]'s brief held.  Here there was no statement that
> defense counsel assisted [Petitioner] in fabricating testimony and, we find
> [Petitioner]'s argument is without merit.

Docket Entry No. 8-5, at 21-32.

Petitioner reiterates the same set of challenges in his instant Petition, presenting these

challenges as sub-grounds of his Grounds Three and Four.  See Docket Entry No. 3-1, at 11-13.

To be entitled to habeas relief on the grounds of prosecutorial misconduct, Petitioner must

establish that the prosecutor's actions "so infected the trial with unfairness as to make the

resulting conviction a denial of due process."[11]  Donnelly v. DeChristoforo, 416 U.S. 637, 643

(1974); see Darden v. Wainwright, 477 U.S. 168, 181 (1986).  In evaluating the likely effect of

improper comments, a court may consider whether the improper comments were invited by the

---

[11] "The touchstone of due process analysis in cases of alleged prosecutorial misconduct
is the fairness of the trial, not the culpability of the prosecutor."  Smith v. Phillips, 455 U.S. 209,
219 (1982).  If it does not infect the entire trial, misconduct alone is not enough to warrant a new
trial.  See id. at 220.  "A criminal conviction is not to be lightly overturned on the basis of a
prosecutor's comments [or conduct] standing alone, for the statements or conduct must be
viewed in context."  United States v. Young, 470 U.S. 1, 11 (1985).  In other words, "the court
must consider the probable effect the prosecutor's [statements] would have on the jury's ability
to judge the evidence fairly."  Id.  Moreover, a prosecutor's statement regarding the credibility of
a witness can constitute grounds for reversal only if the defendant can show that he was actually
prejudiced by those comments.  See United States v. Swinehart, 617 F.2d 336, 339 (3d Cir.
1980).  A determinative factor in that particular analysis is whether the prosecutor's comments
suggested that the prosecutor had knowledge of evidence other than that presented to the jury
during the trial.  See Buehl v. Vaughn, 166 F.3d 163, 176 (3d Cir. 1999) (citations omitted).

particular circumstances of the trial.  Cf. Darden, 477 U.S. at 181-82.  Thus, "Supreme Court

precedent counsels that the reviewing court must examine the prosecutor's [challenged

comment] in context and in light of the entire trial, assessing the severity of the conduct [and] the

effect of the curative instructions."[12]  Moore v. Morton, 255 F.3d 95, 107 (3d Cir. 2001).

 None of Petitioner's allegations meets the aforesaid standard.  It was entirely proper for

the prosecutor to offer Petitioner an opportunity to cast doubt on the credibility of Laura, one of

---

[12]  To the extent Petitioner asserts that the prosecutor's comments introduced unduly
inflammatory evidence into his trial, Petitioner's argument is facially without merit.  For a
habeas petitioner to prevail on a claim that an evidentiary error amounted to a deprivation of due
process, he must show that the error was so pervasive as to have denied him a fundamentally fair
trial.  See Keller v. Larkins, 251 F.3d 408, 413 (3d Cir.), cert. denied, 534 U.S. 973 (2001).
Admission of highly relevant probative evidence cannot be deemed a violation of due process
guarantees simply because the defendant fears that this evidence might have a prejudicial effect.
See, e.g., Estelle v. McGuire, 502 U.S. 62, 70 (1991) (holding that the state court's admission in
petitioner's trial for murdering his infant daughter of the testimony of two physicians that the
child had suffered child abuse (evidence of rectal tearing that was six weeks old and rib fractures
that were seven weeks old); cf. Rivera v. Illinois, 129 S. Ct. 1446, 1454 (2009) ("The Due
Process Clause, our decisions instruct, safeguards not the meticulous observance of state
procedural prescriptions, but the fundamental elements of fairness in a criminal trial") (citation
and internal quotation marks omitted).  Correspondingly, a petitioner faces a steep burden in
establishing a prosecutorial misconduct – committed through inflammatory remarks – capable of
offending the Due Process Clause.  For instance, in United States v. Somers, 496 F.2d 723, 738
(3d Cir. 1974), the prosecutor peppered his opening statement in a public corruption prosecution
with such phrases as: "brazen, contemptuous, and calculating perversion of the public trust,"
"these conspirators operated in a league to systematically enforce their will to corruptly, venally
extract tribute from those who sought to do business in Atlantic City," "[t]heir greed could never
be satiated," "[t]hese defendants ruled Atlantic City, New Jersey as if it was their private
kingdom," and "[t]hey enforced a total feudal system of corruption upon that society and they
acted as the lords of corruption."  Id. at 737 n.26.  While "[c]ategorically disapprov[ing]" of such
colorful remarks during an opening statement, the Court of Appeals nonetheless found that, in
light of the trial court's instruction that the opening statement was not evidence, "whatever
prejudicial effect there may have been was neutralized."  Id. at 738.  Here, Petitioner claims that
the prosecutor's reference to the happy occasion of Archie's birthday cerebration was "unduly
inflammatory" since Petitioner speculates that the jurors might have had experienced additional
sympathy to the victim of Petitioner's crime.  However, a opening-statement reference to the
circumstances of a murder, moreover a reference to circumstances so benign as a mere birthday
celebration, cannot qualify as "inflammatory," especially since a proper jury charge was given.

the State's witnesses, and the mere fact that Petitioner had no information allowing him to cast such doubt could not render the prosecutor's line of questions constitutionally deficient: at no point did the prosecutor elude to any information other than that presented to the jurors during the trial (if anything, the prosecutor's line of questioning stressed *lack* of any other information).

Analogously, it was proper for the prosecutor to draw links between: (a) Petitioner's own testimony (that he was kicking Archie); (b) undisputed forensic evidence of Archie's blood on Petitioner's boot; (c) Laura's testimony as to the point in time when Petitioner began "limping"; and (d) Petitioner's own testimony that he "poked" Archie with the knife.  The mere fact that Petitioner would have preferred for the jurors not to see the connection between these events cannot render the prosecutor's statements constitutionally deficient.

In the same vein, the prosecutor duly: (a) detailed to the jurors finer aspects of Dr. Gross' expert testimony as to the potential maximum depth of penetration Petitioner's knife allowed; and (b) highlighted the potential inconsistency between that potential maximum depth, the actual depth of Atchie's wounds and Petitioner's testimony that he only "poked" Archie with a knife.[13]

---

[13]  As to the prosecutor's reference to "Plato effect," which the state courts as well as Petitioner's counsel and the prosecution did not understand, it is apparent to this Court that the trial prosecutor made reference not to some mysterious "Plato effect" but to the well-known "plateau effect," although that reference was mis-transcribed by the court reporter causing, apparently, years of confusion.  The phrase "plateau effect" or, in alternative, "plateau principle," ensues from the mathematical model (typically utilized in pharmacology, nutrition and biochemistry) explaining that, at a certain point, the effect/effectiveness of any drug reaches its maximum, and that maximum cannot be increased even if the person taking the drug keeps increasing the frequency or dosage of that drug consumption.  See, e.g., William B. Pratt and Palmer Taylor, Principles of Drug Action, Churchill Livingstone (3d ed., June 15, 1990).  Therefore, the point Petitioner's prosecutor made and the jurors heard was merely an expression of the prosecutor's guess that, as the prosecutor stated, "probably," Archie's stimulation ensuing from consumption of cocain reached the *highest point possible* at the time of Archie's murder due to Archie's mixing cocaine with alcohol.  Such reading of the prosecutor's statement renders

(continued...)

Likewise, Petitioner's assertion that the prosecutor misstated state law (as to lack of the "provocation" element) is both unsupported by the record (which shows no incorrect legal statement) and, even if such misstatement was committed, it was negated by the trial judge's instructions and the prosecutor's unambiguous statement to the jurors: "Listen to the Judge's definitions [since h]e'll tell you exactly what the law is."

Finally, the alleged "disparaging" of Petitioner's defense counsel, deduced by Petitioner from the prosecutor opining (during prosecutorial summation) that Petitioner's testimony was "rehearsed" could not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process": the jurors, being the audience of Petitioner's testimony were well in position to draw their own conclusions as to both the spontaneity – or lack thereof – of Petitioner's statements and the degree of Petitioner's counsel's involvement in Petitioner's preparation for trial.

In sum, the state courts' above-quoted conclusions (that the prosecutor's comments, be they taken either individually or in toto, did not deprive Petitioner of fair trial) were not an

---

[13](...continued)
Petitioner's argument a facial non sequitur, since Petitioner construes the prosecutor's statement as a quasi-expert conclusion that Archie was experiencing *no* stimulation.  However, even if the Court were to adopt the odd "Plato effect" reading of the prosecutor's comment (i.e., the reading utilized by Petitioner, Respondents and the state courts), the state courts' determination – that such a non-comprehensible comment could not have "so infect[ed] the trial with unfairness as to make the resulting conviction a denial of due process" – was not an unreasonable application of Donnelly and Darden since an average juror is likely to ignore a minor technical comment which content or exact meaning the juror cannot understand.  Accord, Hiller B. Zobel, The Jury on Trial 42, 44 (Am. Heritage, July-Aug. 1995) (noting jurors' tendency to ignore matters outside the jurors' common sense and experience and, therefore, the "apparent foolishness inherent in asking the ignorant to use the incomprehensible [in order] to decide the unknowable").

unreasonable application of the Supreme Court precedent.  Correspondingly, Petitioner's

Grounds Three and Four do not warrant habeas relief.

### D.    GROUNDS FIVE AND SIX

In his Ground Five, Petitioner asserts that his rights were violated because the trial judge

did not "explain [to the jurors] the significance of imperfect self-defense," and Petitioner

speculates that such alleged oversight prevented the jury from properly considering lesser-

included offenses (which were, indeed, duly charged to the jury).   Analogously, in his Ground

Six, Petitioner maintains that his "trial court's failure to instruct the jury sua sponte not to draw

an adverse inference from the fact that Petitioner's brother, [i.e.] Peter . . . and his cousin, [i.e.]

Andrew Gonzalez, were not called as witnesses to testify about their involvement in the

stabbing" violated Petitioner's constitutional rights.[14]

The relevant Appellate Division's discussion of Petitioner's Ground Five challenges took

four pages and methodically explained to Petitioner that, *under the state law relied upon by*

*Petitioner*: (a) defendants are not allowed to assert "imperfect self-defense," and the proper

charge, if warranted by evidence proffered at trial, must merely include a charge as to reckless,

aggravated and passion-provocation manslaughters; and (b) well in accord with the aforesaid

state law, Petitioner's trial judge did, indeed, give the jurors the charge on passion-provocation,

aggravated and reckless manslaughters, as well as on defenses of self-defense, defense-of-others,

justification of use of force on an intruder, etc.  See Docket Entry No. 8-5, at 17-21.

---

[14]  Notably, state court litigations of the claims corresponding to Petitioner's Ground Five
and Six challenges (which litigation occurred, first, during Petitioner's direct appellate
proceedings, and then was revisited by state courts during his PCR proceedings, since Petitioner
reiterated these challenges in his pro se PCR brief) relied *solely and exclusively on state* law.

With regard to Petitioner's Ground Six challenges, the Appellate Division recited the

relevant facts and held as follows:

> At the charge conference, the judge thought that there were two witnesses for
> whom a so-called Clawans charge might have been appropriate: Peter . . . and
> Andrew Gonzalez. [See] State v. Clawans, 38 N.J. 162 (1962).  Defense counsel
> advised the judge that he would not be requesting such a charge.  Further, at the
> end of the charge conference defense counsel stated:
>
>> Your Honor, one, with regard to the Clawans charge issue, we're not -
>> neither of us are requesting a Clawans charge with regards to [these
>> witnesses] but, I guess I should also - it's not my intention to make
>> reference to their absence, and I assume that - that it's not the intention of
>> the prosecutor to make reference to their absence.
>
> Clearly, defense counsel gave careful thought to the possibility of such a charge.
> At defendant's motion for a new trial, however, counsel asserted for the first time
> that the judge should have sponte delivered a charge in conformance to that
> suggested in State v. McGraw, 129 N.J. 68 (1992).  We must review the failure of
> the judge to sua sponte give a McGraw charge under the standard of plain error.
> In fact, Judge Connor said he interpreted the colloquy with the prosecutor and
> defense counsel to mean that defendant did not want to highlight the fact that
> neither Peter . . . nor Andrew had testified, a tactical decision that defendant
> wanted to "leave the matter alone."  Defendant made the application at the time of
> the motion for a new trial because of a post-trial newspaper article quoting one of
> the jurors, Aisling Swift.  Judge Connor read pertinent parts of the article into the
> record:
>
>> A juror said she was relieved when [the trial judge] revealed [Petitioner']
>> prior conviction.  "My heart was beating so hard - " she said, asking that
>> her name not be used.  "I was thinking to myself I made the right
>> decision." [Petitioner] confessed [that Peter] gave him the knife which he
>> put in his pocket until [Archie] returned.  Jurors put the knife in their
>> pockets walking around, finding that it was difficult.  The jurors said that
>> the handle side down it poked him, but was harder to keep in a pocket
>> blade side down.  She added, "We think he had it in his hands." . . .  They
>> . . . found no manslaughter charges fit the crime.  Because [Petitioner's]
>> taped confession didn't say he was defending [Peter], although he testified
>> to that [during the trial], she said, they didn't believe him and knowing
>> [the] witness list included Andrew . . . and [Peter], who didn't testify, they
>> wanted their versions if [Petitioner] was defending [Peter], but what
>> clinched the murder conviction, she said, was when the [tried judge re-
>> explained to them the elements of] self-defense and defense of others.

> The key words were greater force and a greater weapon she said, and
> [Archie] wasn't armed when attacked by three men.  Everybody else was
> using their fists she said.  If [Petitioner] had used his hands it would have
> been different.
>
> . . .
>
> [Petitioner] asserts that the judge's failure to give a <u>McGraw</u> charge denied him a
> fair trial.  There are two flaws with defendant's assertion.  First, in [<u>McGrow</u>], the
> [New Jersey Supreme] Court was trying to address a <u>Clawans</u> problem . . . where
> . . . defendant had not asked for a charge.  In contrast, the current defense counsel
> specifically refused a <u>Clawans</u>.  A . . . defense counsel cannot make a tactical
> decision to refuse a <u>Clawans</u> charge and then, when a conviction is returned,
> invoke <u>McGraw</u> to deal with a <u>Clawans</u>-type witness.  Second, <u>McGraw</u> holds
> that defendant must first establish the witness's unavailability "during [an
> evidentiary] hearing . . . ."  "[T]he witness must invoke the privilege in person to
> be excused from testifying."  There is no indication on this record that [Peter]
> invoked his Fifth Amendment right other than defense counsel's assertion that
> Peter's unavailability was 'placed on the record."  Indeed, defense counsel agrees
> that there was no proceeding during which [Peter or Andrew] invoked [the] right.

<u>Id.</u> at 33-35.

Generally, a jury instruction (or lack of one) does not merit federal habeas relief even if

the instruction, as given, is inconsistent with state law.  A habeas petitioner who challenges state

jury instructions must "point to a federal requirement that jury instructions . . . must include

particular provisions" or demonstrate that the jury "instructions deprived him of a defense which

federal law provided to him."  <u>Rosemeyer</u>, 117 F.3d at 110;[15] <u>cf.</u> <u>Henderson v. Kibbe</u>, 431 U.S.

---

[15] This is because district courts do not "sit as super state supreme courts for the purpose
of determining whether jury instructions were correct under state law . . . ."  <u>Rosemeyer</u>, 117
F.3d at 110.  Thus:

> In considering whether this case involves a claim of error under the Constitution,
> laws, or treaties of the United States, it is critical to remember that the Supreme
> Court has made it clear that the states define the elements of state offenses.
> Accordingly, while there may be constitutionally required minimum criteria
> which must be met for conduct to constitute a state criminal offense, in general

(continued...)

33

145, 155 (1977) ("An omission or incomplete instruction is less likely to be prejudicial than a misstatement of the law").

> [T]he only question for [federal courts sitting in habeas review] is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." It is well established that the instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record. In addition, in reviewing an [arguably] ambiguous instruction . . . , [federal courts] inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution. And we also bear in mind our previous admonition that [federal courts] "have defined the category of infractions that violate 'fundamental fairness' very narrowly."

Estelle v. McGuire, 502 U.S. at 72-73.

Here, Petitioner's Ground Six expresses nothing but his disappointment with the fact that the trial judge omitted to "buttress" Petitioner's theory of the case (that he acted in defense of Peter) by failing to instruct the jury not to wonder why Peter and Andrew were not called as defense witnesses.[16] However, since the jurors were, indeed, fully availed to Petitioner's

---

[15](...continued)
there is no constitutional reason why a state offense must include particular elements. See McMillan v. Pennsylvania, 477 U.S. 79, 84-86 (1986). . . . Put in a different way, the jury instructions on justification, even if correct under state law, would need to have relieved the state of the necessity of proving an element of the offense as required by federal law or to have deprived the petitioner of a defense the state had to afford him under federal law in order to be significant in a federal habeas corpus action. If we concluded that a petitioner could obtain habeas corpus relief without making such a showing, then district courts in habeas corpus cases would sit as super state supreme courts for the purpose of determining whether jury instructions were correct under state law with respect to the elements of an offense and defenses to it.

Rosemeyer, 117 F.3d at 110.

[16] It appears that, in conjunction with his Ground Five challenges, Petitioner now
(continued...)

testimony and his defense-of-others theory of the case, Petitioner has no basis for asserting that the alleged omission in the jury instruction somehow stripped Petitioner of the defense he wished to present.  Simply put, the fact that the jurors did not find Petitioner's defense-of-others theory of the case supported by the evidence does not mean that Petitioner was denied an opportunity to present this defense-of-others theory of the case to his jurors.  Correspondingly, the alleged omission did not offend the protections ensuing from the Due Process Clause.

While Petitioner's Ground Six claim is insufficient to merit habeas relief, his Ground Five fares even worse.  The instructions given by the trial judge by no means allowed the jury to apply the charge in a way that violated the Constitution or offended the principles of fundamental fairness.  The lesser-included offenses were carefully charged to the jurors, element by element, and all relevant defenses allowed by the state law were analogously charged to the jurors, element by element.  The record is abundantly clear that Petitioner was convicted because the jurors found Petitioner's theory of defense incompatible with the facts established at the trial.

The state courts' dismissal of Petitioner's claims corresponding to his instant Ground Five was not an unreasonable application of the governing Supreme Court precedent, as was the state courts' dismissal of Petitioner's claims corresponding to his instant Ground Six.

---

[16](...continued)
speculates, self-servingly, that Peter and Andrew might have testified that Petitioner acted in Peter's defense.  However, if so, Petitioner offers this Court not a shred of evidence in support of this claim (and Petitioner's trial counsel, during his motion for a new trial, opined that Peter and Andrew would, more likely than not, have "cooperated" with the State had they been called as witnesses).  Moreover, the *physical involvement* of Peter and Andrew in their altercation with Archie was well detailed to the jury (hence allowing the jurors to decide for themselves the danger Peter was in), and this Court cannot see how Peter or Andrew could have testified as to Petitioner's *state of mind* at the time of Petitioner's "poking" Archie with the knife.

35

Finally, to the degree Petitioner relies on state law for the purposes of his Grounds Five and/or

Six (which reliance was proven legally meritless by the state courts, which explained Petitioner

his errors under the state law for the purposes of both these Grounds), Petitioner's challenges fail

to state a cognizable claim altogether: district courts do not "sit as super state supreme courts for

the purpose of determining whether jury instructions were correct under state law." Rosemeyer,

117 F.3d at 110.  Both Grounds Five and Six shall be dismissed.

### E.      GROUNDS SEVEN AND EIGHT

In his last two Grounds, Petitioner asserts that his rights were violated by performance

rendered by his trial counsel.[17]

### 1.      General Legal Principles

The Sixth Amendment, applicable to states through the Due Process Clause of the

Fourteenth Amendment, guarantees the accused the "right . . . to have the Assistance of Counsel

for his defense."  U.S. Const. amend. VI.  The right to counsel is the right to the effective

---

[17]  In the body of his Ground Eight challenges, Petitioner also asserts a one-sentence claim based on the assistance provided by his appellate counsel.  Petitioner's challenges to assistance of trial and appellate counsel were raised during Petitioner's PCR proceedings. Petitioner's first round of PCR challenges resulted in the Appellate Division's remand to the Law Division; that remand was *not* based on a substantive error in the Law Division's rulings; rather, it ensued from Petitioner's assertion that his PCR counsel raised only the grounds the PCR counsel found meritorious and declined to raise the challenges desired by Petitioner.  In light of the state law obligating PCR counsel to raise all claims desired by their clients, the Appellate Division remanded Petitioner's PCR application with a directive to the trial judge to address all PCR claims Petitioner desired to raise against the best discretion of his PCR counsel. The Law Division complied, examining Petitioner's PCR application on all grounds (i.e., raised by Petitioner and those raised by the PCR counsel); that second round of PCR review resulted in denial of post-conviction relief, which was affirmed by the Appellate Division, and the Supreme Court of New Jersey denied Petitioner certification.

assistance of counsel, and counsel can deprive a defendant of the right by failing to render adequate legal assistance.  See Strickland v. Washington, 466 U.S. 668, 686 (1984).

A claim that counsel's assistance was so defective as to require reversal of a conviction has two components, both of which must be satisfied.  See Strickland, 466 U.S. at 687.  First, the defendant must "show that counsel's representation fell below an objective standard of reasonableness."  Id. at 687-88.[18]  The court must then determine whether, in light of all the circumstances at the time, the identified errors were so egregious that they were outside the wide range of professionally competent assistance.  See id.

To satisfy the prejudice prong, the defendant must show that "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  Id. at 695.   As the Supreme Court explained,

> [i]n making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.  Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways.  Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect.  Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.  Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must

_____

[18]   See also, Strickland, 466 U.S. at 689 ("Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy"); Thomas v. Varner, 428 F. 3d 491, 499 (3d Cir. 2005) ("To overcome the Strickland presumption that, under the circumstances, a challenged action might be considered sound trial strategy, a habeas petitioner must show either that: (1) the suggested strategy (even if sound) was not in fact motivating counsel or, (2) that the actions could never be considered part of a sound strategy").

ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

Strickland, 466 U.S. at 695-96.[19]

The Strickland test applies to the performances of both trial and appellate counsel.  See Lewis v. Johnson, 359 F.3d 646, 656 (3d Cir. 2004).  When the issue is appellate counsel's failure to raise specific issues, a petitioner satisfies the first Strickland prong by showing that appellate counsel was "objectively unreasonable [i.e.,] that counsel failed to find [arguably] nonfrivolous issues and to file a merits brief about them."  Smith v. Robbins, 528 U.S. 259, 285 (2000).  An arguably nonfrivolous issue is "one that counsel can argue in good faith with some potential for prevailing." Id.  Consequently, the general principle established by Smith is that appellate counsel need not raise every non-frivolous issue on appeal; he "may select from among them in order to maximize the likelihood of success on appeal."  Id. at 288; see also Jones v. Barnes, 463 U.S. 745, 750 (1983) (rejecting "per se rule that appellate counsel must raise every nonfrivolous issue").

## 2.  State Court's Factual Findings and Legal Conclusions

The Appellate Division's discussion of Petitioner's PCR challenges, including the claims raised here as Grounds Seven and Eight, was pithy; it merely read: "[All Petitioner's] arguments lack sufficient merit to warrant discussion in a written opinion. We affirm substantially for the reasons expressed by [the trial judge] in his oral opinion delivered from the bench on September 5, 2008." State v. Sierra, 2010 WL 3257965 (Aug. 18, 2010).

_____

[19]  The Supreme Court instructs that a court need not address both components of an ineffective assistance claim "if the defendant makes an insufficient showing on one."  Strickland, 466 U.S. at 697.  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."  Id.

The trial judge ruled on Petitioner's PCR challenges as follows:

It's alleged that [defense] counsel's trial preparation failed to meet constitutional standard of adequacy, that he failed to interview and call necessary witnesses. There are allegations in that respect but there is nothing which indicates a specific witness, what that witness would have said or that what that witness said would have changed the outcome. It's alleged that counsel failed to investigate and consider intoxication, diminished capacity or insanity as defenses in this matter. There is no showing that counsel was deficient in that respect, and there's a number of reasons. At best, what we have in the medical records which were submitted, would be a so-called mood disorder, talking either major depression and the – one of the things that – one of the medical records wanted to rule out was bi-polar. There is no indication whatsoever of a thought disorder which would effect the thinking process as opposed to the mood or affect of the Petitioner. We certainly do have a history in New York of depression, we have suicidal gestures there. Post this incident we have suicidal gestures or suicidal ideation which was seen in the AtlantiCare Regional Medical Center, and we have the records there before. There's nothing to indicate the inability to think. There is nothing there which would support a diminished capacity or insanity defense at the time of the events complained of. They would perhaps support depression and that mental health issue might have had some relevance at sentence. It didn't, for reasons which I'll get to, but that's where it would belong if it belonged anywhere in this case. There's no indication – there is clearly a history of drug and alcohol use, perhaps an issue with respect to chemical dependency, but on the night in question, whatever may have been in the background, and we have [Petitioner's] own testimony during the course of trial, his ability to recall, his ability to recount, his ability to state what was going on, none of that would in any way support any of [the lack of full mental capacity] he alleges or argues here today.  . . .  To deal with some other issues which were raised in this particular case, let me say this as well, it's alleged with respect to the juror who had a seizure, I previously ruled, would incorporate by reference that, but very clearly this individual had a transitory medical problem, a appropriate recess was taken, inquiry was made of him, [I] made sure that there was a read back which would cover everything, and we were only dealing with a very short period of time. That juror didn't even need to seek any medical attention, and did not. He was perfectly capable of proceeding and perfectly capable of continuing his service as a juror. The air conditioning system in that old courthouse was always problematic. Having said that, with some hyperbole concern, it was unpleasant, but if it became truly impossible for people to concentrate, people to participate, this Court would have taken a recess. It did not rise to that standard. I note that the courtroom in question, my old courtroom in the old building, was the original courtroom in the County of Atlantic, so in from about 1848 on, that courtroom got used for trials. It didn't have air-conditioning back then. So it was, while not pleasant, it was suitable for the continuation of a

trial and I will hold that there was no impact whatsoever with respect to the problematic ventilation. . . .  I hold that there is no ground for post-conviction relief and would deny the [PCR] application.

Docket Entry No. 8-40, at 21-25 and 29.

### 3.    Petitioner's Assertions at Bar

In his Grounds Seven and Eight, Petitioner asserted a multitude of sub-grounds

challenges assistance of his counsel.  Specifically, he alleged that:

[i]n the case at bar[, unspecified] discovery [efforts] showed that there were several witnesses who could have assisted counsel in developing defenses, including Peter . . . and Andrew . . . .  Trial counsel was well aware that Peter . . . and Andrew . . . had given [certain] statements to the authorities and, through their testimony [the trial counsel] could developed a basis for an alternative defense (i.e. self-defense and defense of others) and impeach the credibility of the states case and its witnesses. . . .  Additionally, counsel was provided with copies of restraining orders which were granted against [Archie].  At a minimum, trial counsel should have looked into any violent propensities on the part of [Archie] and made motions to be allowed to present this information to the jury.  . . .  Prior to trial, Petitioner discussed his medical history with counsel, believing such information may have an impact on, or form the basis of a possible affirmative defense.  Petitioner also informed counsel that he suffered from moderate to severe depression as a young teen; that he dropped out of school at the age of 15 due to drug and alcohol use; that he began abusing drugs and alcohol to the extent he was forced to sell drugs to support a growing addiction; and even spoke of having suffered from severe depression at a later age to the point he had attempted suicide.  Trial counsel rejected using this information, claiming "if he used this information to support an affirmative defense" it will not be accepted by the jury; and if he were to proceed with the defenses, it will negate the one he intend to pursue at trial, one based on self-defense [or Petitioner's version of defense, i.e., "defense of others," allegedly, Peter].   Petitioner's mental health history . . . indicated that the Petitioner was a chronic substance abuser who had a history of mental instability.  . . .  Since the primary defense involved Petitioner's actions in response to those of [Archie] (who was using both cocaine and alcohol and was acting aggressive as a result thereof) any thing which could have affected Petitioner[] . . . should have been explored and should have been [offered] to the jury. . . .  During the trial, there were at least two instances which [Petitioner believes indicated that] the jury's ability to concentrate on the trial [was affected].  In neither instance, did counsel object nor did Petitioner's appellate counsel raise any of these issues on direct appeal.  Petitioner asserts that the record shows that one of the jurors suffered a seizure during the testimony of Ana . . . .  The court . .

. asked the juror what his last recollection was.  The juror did not recall.  The following morning, . . . the trial court ordered the court stenographer to read the portion of Ana['s] . . . testimony which the juror claimed he did not hear. Additionally, on November 9, 1998, the ventilation system in the courtroom failed, leaving the courtroom intolerably hot.  Although the judge wisely decided to relocate, another courtroom was unavailable and the trial continued.  In light of the heat, [Petitioner believes] the jurors were unable to concentrate on the issues and testimony in the trial.

Docket Entry No. 3-1, at 21-24.

### 4.    Petitioner's Grounds Seven and Eight Are Without Merit

### a.    Alleged Failure to Locate and Call Unspecified Witnesses

Petitioner's next argument is that [his defense counsel's] performance was deficient because [the defense counsel] failed to locate and present [certain testimonial evidence.]  Petitioner speculates that [such testimonial evidence] might have [supported his theory of the case] and he deduces from that speculation that [his defense counsel']s failure to locate [such evidence] and investigate [it] was an act of ineffective assistance within the meaning of the Strickland standard.  In . . . Rolan v. Vaughn, 445 F.3d 671 (3d Cir. 2006). . . . [the Court of Appeals] underscores two key principles governing this type of inquiry: (a) counsel is not obligated to chase after the wind (e.g., by striving to locate [long-shot evidence]) in hopes of stumbling upon a [piece of evidence that] might turn out favorable; and (b) habeas relief may be warranted only upon the petitioner's showing that [such evidence was] so favorable to the petitioner that lack thereof resulted in prejudice to the petitioner's case within the meaning of the second prong of Strickland.  See Strickland, 466 U.S. at 690-91; see also Kimmelman v. Morrison, 477 U.S. 365, 384 (1986);  accord Lewis v. Mazurkiewicz, 915 F.2d 106 (3d Cir. 1990) (expressly adopting Strickland and Kimmelman rationale for the purposes of failure-to-investigate analysis).

Echols v. Ricci, 2011 U.S. Dist. LEXIS 93833, at *98-102 (D.N.J. Aug. 19, 2011), aff'd, 2012

U.S. App. LEXIS 14803 (3d Cir. July 19, 2012) (quoting Strickland, 466 U.S. at 691, for the

observation that "counsel has a duty to make [only] reasonable investigations or to make a

reasonable decision that makes particular investigations unnecessary").

Here, Petitioner named only two witnesses who were not called to testify at his trial, i.e.,

Peter and Andrew, while lumping all other – purely hypothetical – witnesses into an unspecified

41

category of "All Necessary Witnesses."  However, as the Law Division correctly held, "there is nothing which indicates a specific witness, what that witness would have said or that what that witness said would have changed the outcome."  Indeed, Petitioner offers this Court only his self-serving guesses that such witnesses could have been located, that they might have testified to "something," and that such "something" could have, somehow, lended support or credence to Petitioner's theory of the case.  However, Petitioner's guesswork cannot be accepted in lieu of actual evidence.  Cf. Salyer Land Co. v. Tulare Lake Basin Water Storage Dist., 410 U.S. 719, 731 (1973) (legal "adjudication cannot rest on any such 'house that Jack built' foundation").  In order to state a cognizable claim, he had to show that such witnesses actually existed, that they would have been both willing and able to testify to specific material facts, and these specific facts would have been so favorable to Petitioner that, without such "hypothetical" testimony, Petitioner suffered prejudice within the meaning of the second prong of Strickland.  See Strickland, 466 U.S. at 690-91; see also Kimmelman v. Morrison, 477 U.S. 365, 384 (1986); accord Lewis v. Mazurkiewicz, 915 F.2d 106 (3d Cir. 1990).

In other words, here, Petitioner merely laments that his defense counsel could have but did not chase after the wind; however, the Sixth Amendment protections do not entitle Petitioner to habeas relief on the basis of such lamentation.  See Echols, 2011 U.S. Dist. LEXIS 93833, at *98-102.  Therefore, the state court's denial of Petitioner's claims to that effect was not an unreasonable application of Supreme Court precedent, and this aspect of Petitioner's Sixth Amendment challenges based on hypothetical testimonies of hypothetical "Necessary Witnesses" warrants no habeas relief.

b.        **Counsel's Decision Not to Call Peter or Andrew as Witnesses**[20]

Petitioner also maintains that his trial counsel's performance failed to meet the Sixth

Amendment guarantees because Andrew and Peter were not called as witnesses.  However, that

decision was a strategic choice this Court has no mandate to second-guess.

Indeed, even the state courts correctly noted:

Defense counsel advised the judge . . . :

> Your Honor, . . . it's not my intention to make reference to their absence . . .
> . .

Clearly, defense counsel gave careful thought to [the issues related to Peter and
Andrew's absence].

Docket Entry No. 8-5, at 33.

And, as this Court already pointed out: (a) Petitioner's trial counsel, during his motion for

a new trial, opined that Peter and Andrew were likely to cooperate with the State had they been

called as witnesses; (b) the record shows that all aspects of *physical involvement* of Peter and

Andrew in their altercation with Archie were well detailed to the jury; and (c) it is self-evident

that neither Peter nor Andrew could have testified to Petitioner's *state of mind*.  Since all

potentially favorable aspects of the testimonies that Peter and Andrew might have provided

were, indeed, presented to the jurors, and Petitioner was availed to an opportunity to convey to

the jurors his perception of events (including Petitioner's version of Peter and Andrew's

---

[20]  In his Petition, Petitioner concedes that, at the time of Petitioner's prosecution and
trial, "Andrew . . . was out of the jurisdiction and *could not be located*."  Docket Entry No. 3-1,
at 20 (emphasis supplied).  In light of this concession, Petitioner's assertion that his counsel was
ineffective for failing to locate someone who *could not be located* appears facially frivolous.
However, as the Court's discussion stated <u>infra</u> illustrates, even if the Court were to presume that
Andrew was, somehow, available for testimony, Petitioner's challenges fail under the test posed
by <u>Strickland</u>.

involvement in the events and Petitioner's version of how that involvement corresponded to Petitioner's own actions), while (c) Peter and Andrew's actual testimonies might have been injurious to Petitioner's interests, it was an entirely reasonable strategic choice for Petitioner's trial counsel not to gamble and, therefore, not to try calling Peter and Andrew as witnesses.

Correspondingly, Petitioner's claims fail to meet the first prong of <u>Strickland</u>, and this Court need not even reach the second prong analysis. It follows that the state courts' dismissal of Petitioner's challenges based on his counsel's decision to avoid calling Peter and Andrew as witnesses was not an unreasonable application of Supreme Court precedent. Therefore, Petitioner's instant challenges based on that strategic decision should be dismissed.

### c.      Counsel's Decision Not to Proffer an Order of Protection

Petitioner's challenges based on his counsel's omission to proffer an allegedly existing protection order issued at an unspecified point in time against Archie (with regard to protection of unspecified individuals) fail for the reasons identical to those detailed in the prior sub-section of this Opinion.

While Petitioner speculates that introduction of such order of protection into evidence might have suggested to the jurors Archie's "violent propensities," Petitioner's defense counsel could have valid reasons for not seeking admission of this order into evidence. Indeed, Archie's erratic behavior and emotional/physical stimulation caused by Archie's consumption of drugs and alcohol on the night of his murder were well depicted to the jury, and evidence of a protective order having no connection to the events that took place on that fatal night would have added little, if anything, to Petitioner's theory of the case. However, while adding little or

44

nothing in support of Petitioner's position, such evidence could have substantially disadvantaged Petitioner's case.

Correspondingly, Petitioner's defense counsel, who was having little or nothing to gain from proffering the alleged order of protection but who was facing the risk of substantially hurting Petitioner's position by introducing the alleged order of protection into evidence, was well entitled to make the strategic choice he actually made, i.e., not to bring this problematic piece of evidence to light.  Therefore, Petitioner's claim based on the alleged order of protection fails to meet the first prong of Strickland, and dismissal of such challenges would not be an unreasonable application of Supreme Court precedent.[21]  Petitioner's claim based on the alleged order of protection merits no habeas relief.

### d.    Petitioner's Alleged Mental Incapacity

Petitioner attempts to assert that his counsel should have mounted a defense based on his mental incapacity based on his history of alleged depression and substance abuse (manifested, apparently, many years and even decades prior to the events at issue), as well as on his alleged suicide attempt on the morning following Petitioner's killing of Archie.  Petitioner's claims are facially without merit.  As Petitioner's trial judge correctly observed,

---

[21]  The Court's review of Petitioner's numerous and exceedingly lengthy submissions made during both rounds of his PCR proceedings failed to locate a claim based on the alleged order of protection.  Therefore, this claim appears unexhausted and renders the entire Petition "mixed" and subject to dismissal on that ground (unless Petitioner would withdraw that claim or obtain stay under Rhines v. Weber, 544 U.S. 269, 277-78 (2005)).  However, the Court need not reach the Rhines issue since it has the mandate to dismiss this claim, for being facially meritless, pursuant to Section 2254(b)(2): "An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2); Lambert v. Blackwell, 387 F.3d at 260 n.42; Lewis v. Pinchak, 348 F.3d at 357.

> [a]t best, what we have in the medical records [of] so-called mood disorder [and] depression . . . .  There is no indication whatsoever of a thought disorder which would effect the thinking process . . . .  There is nothing there which would support a diminished capacity or insanity defense at the time of the events complained of.  . . . [T]here is clearly a history of drug and alcohol use, . . . but on the night in question [Petitioner's ability to think or memorize the events was unaffected:] . . . we have [Petitioner's] own testimony during the course of trial [verifying] his ability to recall, his ability to recount, his ability to state what was going on, none of that would in any way support any of [the lack of full mental capacity] he alleges . . . .

Docket Entry No. 8-40, at 22-22.

Since Petitioner's medical records contain information either wholly irrelevant or insufficient to establish the defense he now wishes to assert, his counsel's omission of this information could not violate Petitioner's rights within the meaning of the second prong of Strickland.[22]  See Strickland, 466 U.S. at 695.  And since Petitioner's theory of the case (asserting defense of Peter) was necessarily based on Petitioner's having sufficient capacity at the time when he "poked" Archie with the knife, Petitioner's counsel could have made a reasonable strategic choice to avoid introducing evidence undermining Petitioner's theory of the case, and – under the first prong of Strickland – this Court has no basis to second-guess that choice.  Correspondingly, Petitioner's claim based on his history of alleged "depression" and substance abuse is without merit.

Petitioner strives to cure the deficiency of this challenge by trying to capitalize on the fact that his defense counsel moved for new trial (after Petitioner was convicted) by asserting, inter alia, that he might have been interested in raising some form of capacity defense.

---

[22]  The most relevant piece of information is Petitioner's assertion that he attempted suicide on the morning after Archie was murdered.  However, Petitioner's *after*–thoughts or *after*-actions are of no relevance to his state of mind *during* the murder, especially since he was examined by psychiatrists, found in full capacity and even denied attempting that suicide.

46

Seemingly reading that motion as his counsel's "admission" that counsel committed some form of strategic error, and then equating such deduced "error" with his belief that this "error" must be of constitutional magnitude, Petitioner now maintains that his Sixth Amendment rights were violated by counsel's not pursuing his "second-choice" strategy first.  However, the fact that Petitioner's counsel, having made such motion, renders no support to Petitioner's claims here.[23] See Strickland, 466 U.S. at 689 ("the defendant must overcome the presumption that, under the circumstances [existing at the moment when counsel was making his/her strategic choice], the challenged action might be considered sound trial strategy"); Thomas, 428 F. 3d at 499 (3d Cir. 2005) ("To overcome the Strickland presumption that, under the circumstances, a challenged action might be considered sound trial strategy, a habeas petitioner must show either that: (1) the [original] strategy [even if later proven unsuccessful] was not in fact motivating counsel or, (2) that [such original choice] could never be considered part of a sound strategy").

Therefore, the state courts' dismissal of Petitioner's challenges (based on his counsel's initial strategic choice not to try recasting Petitioner's mental problems into a lack-of-capacity defense) was not an unreasonable application of Supreme Court precedent.  Therefore, Petitioner's challenges asserting the same in the instant matter merit no habeas relief.

> **e.** **Claims Based on Juror's Seizure and Warmth of Courtroom**

---

[23]  Indeed, had it been otherwise: (a) every defense counsel would be reluctant or outright avoid making a "last hope bid" in an attempt to save his/her client's case by offering an alternative theory/ground during post-trial motion(s) out of sheer fear that such "last bid" would be utilized by the client against counsel; and (b) criminal defendants would be poorly served by such reluctance since, even if a very small percentage of criminal defendants succeed by means of a "lat hope bid," these defendants's cases should not be obstructed by undue timidity of their counsel.

Two final lines of Petitioner's claims attacking the assistance rendered by his trial counsel assert, de facto, that his counsel should have challenged the jurors' capacity to perform jury duty.  Specifically, Petitioner maintains that his counsel erred by failing to enter objections when: (a) one of the jurors briefly fainted during Ana's testimony but, upon offering the trial judge assurances as to his capacity and well-being, that juror has the small part of Ana's testimony missed read to him, word-to-word, from the actual trial record; and (b) when, noting that the courtroom became uncomfortably warm, the trial judge attempted to move the trial (and the jurors) into another, comfortably cool, courtroom but – having no such comfortable courtroom available, continued the trial in the less comfortable one.

This type of challenge is often entered by habeas litigants who had a juror falling briefly asleep.  Dealing with such assertion, one court observed:

> Proceeding under 28 U.S.C. § 2254, petitioner . . . seeks relief [claiming] that his attorney provided ineffective assistance of counsel by not bringing to the attention of the court the fact that one or more jurors were sleeping at various times throughout the trial.  . . .  Even accepting the facts in the light most favorable to [petitioner], he cannot show that the [state courts] misapplied the Strickland standard in any unreasonable fashion. [The state court correctly] surmised that it could have been sound trial strategy to forego an objection to a sleeping juror. . . . Other courts have also noted the strategic considerations involved when a juror has been sleeping.  For instance, the Second Circuit observed:
>
>> We express no view as to a situation in which deliberations had clearly begun when a report of a sleeping juror was made.  On the one hand, a mistrial would likely be a desirable result to a defendant in some such cases.  But it is also quite possible that an effective defendant's counsel would in some situations prefer to keep the allegedly dozing juror in place, and try for the possibility of an acquittal or a hung jury.

Ciaprazi v. Senkowski, 151 F. App'x 62, 64 (2d Cir. 2005).

Another panel of the Second Circuit made a similar observation:

> even if trial counsel saw a distracted juror, it was among the objectively
> reasonable strategic choices for counsel to forgo an objection.  The juror
> in question may have been one that defense counsel favored and wanted to
> keep.  Or counsel may have concluded that pursuing the matter would
> have been fruitless, since the trial court had discretion to decide how to
> remedy such a problem and had already called the jurors to attention.

Guinyard v. Keane, 56 F. App'x 44, 46 (2d Cir. 2003).

> . . .  In hindsight it is always easy and convenient to insist on perfection when
> things haven't gone one's way; but the deference built-into the Strickland analysis
> forbids courts from being so presumptuous.  And when the claim is brought under
> § 2254, a further level of deference – that owed to state court determinations –
> doubly forbids this court from granting the petitioner the relief he seeks. . . .
>
> Moreover, even if his counsel's performance was deficient, [petitioner] establishes
> no hint of prejudice resulting from his counsel's allegedly ineffective assistance.
> Again, he seems to believe he is entitled to an error-free trial and that any error
> constitutes presumptive grounds for habeas relief.  But that is not the standard.
> Instead, under Strickland, a petitioner must demonstrate a material error, i.e., one
> which caused the outcome of the trial to be different. . . .  Here, even taking the
> evidence in [petitioner's] favor, it merely shows that one of the twelve jurors
> failed to pay attention during significant portions of the trial. . . . [H]ad several
> jurors slept through substantial portions of the [entire] trial, the outcome of the
> trial could be called into question.  But when the allegation is that one of the
> jurors was sleeping, it is much more difficult to show prejudice.  Although
> [petitioner] is entitled to twelve attentive jurors in the first instance, under an
> ineffective assistance review the improper conduct of one of them does not
> establish a reasonable probability – or even a slight one – that the outcome of his
> trial would have been different. [See] Hall v. Groose, 1994 U.S. App. LEXIS
> 2982 (8th Cir. 1994) ("Hall did not assert a reasonable probability that the
> outcome would have been different had counsel objected to the sleeping juror").

Rieth v. Burton, 2006 U.S. Dist. LEXIS 37250 (E.D. Wis. May 24, 2006) (citations to state law,

footnotes and original emphasis omitted); see also Ahedo v. Sec'y, 2011 U.S. Dist. LEXIS 15021

(M.D. Fla. Feb. 2, 2011) ("even if his counsel's performance was deficient, Petitioner does not

demonstrate prejudice. . . .  Here, . . . it merely shows that one of the six jurors failed to pay

attention during significant portions of the trial. . . .  The other jurors testified that during

deliberations, no juror appeared confused, and all jurors actively participated.  There is no

allegation that any other juror in addition to [the one at issue] was sleeping or otherwise inattentive during the trial. Under an ineffective assistance of counsel review, [that juror's] sleeping during portions of the trial does not establish a reasonable probability that the outcome of his trial would have been different").

Here, the circumstances at hand are far less problematic than those addressed (and found not warranting habeas relief) in Rieth and Ahedo. There is no question that, here: (a) the juror, who had a seizure, fainted only for a very brief period of time; (b) Petitioner's trial judge, nonetheless, conducted a detailed inquiry of that juror; (c) the juror stated that he needed no medical attention; (d) the trial court, observing the juror, made a factual finding as to juror's full capacity to continue with his jury duties; (e) the record of Ana's testimony missed by the juror was read to him; and (f) the juror proceeded to actively participate in deliberations and rendering the verdict. Because Petitioner offers this Court no clear and convincing evidence showing that the trial judge's finding as to the juror's full capacity to perform his jury duties, and because Petitioner merely limits his claims to a bold assertion that his counsel should have objected to "something," Petitioner cannot meet the test posed by either the first or the second prong of Strickland.

Moreover, Petitioner's challenge based on his counsel's election not to object to continuation of the trial in an allegedly uncomfortable warmth of the courtroom facially fails to meet both prongs of Strickland. While Petitioner was entitled to a fair trial by his peers, no language in the Constitution entitled him to a trial by peers enjoying the pleasantries of cool air. In other words, the generous concern of Petitioner's trial judge about maximum comforts of the

fact-finder, while admirable, was by not means a constitutionally-mandated measure.[24]  On the other side of the same coin, the trial court's inability to find a more pleasant environment and to relocate the jurors into such environment could not render the performance of Petitioner's fact-finder deficient.  No statement in the record suggests that *any* juror complained, suffered a medical condition or, moreover, indicated to the trial judge inability to perform jury duties on November 9, 1998, as a result of the courtroom conditions;[25] moreover, the brief seizure suffered

_____

[24]  As the trial judge correctly observed, the very fact that trials have been conducted in his courtroom year-round since 1848 indicated, by itself, that constitutional guarantees could not have been offended by fluctuation of air temperature in that courtroom.  The first known use of an air-condition-like device took place in the United States 1881 (i.e., more than thirty years after that courtroom came in use), when naval engineers constructed a box containing ice water, with a fan blowing air over it, to alleviate the sufferings of dying President Garfield; air-conditioning of office buildings and akin became common in the United States only in late 1920's (i.e., more than eighty years after the courtroom at issue came in use), with the House of Representatives getting an air-conditioner only in 1928, and the Senate, White House and Supreme Court obtaining the same only in the following years.  See <<http://www.facstaff.bucknell.edu/mvigeant/therm_1/ac_ final/bg.htm>>. Meanwhile, the Bill of Rights, including the Sixth Amendment, has been faithfully applied within American courtrooms since December 15, 1791, that is, for about 150 years prior to the point in time when air-conditioning became a common courtroom feature.

[25]  The record shows that Petitioner's trial proceedings commenced on November 4, 1998, and continued throughout November 17, 1998, when both sides delivered their summations.  See Docket Entries Nods. 8-28 to 8-36.  On November 9, 1998, that is, the day when Petitioner claims the courtroom of his trial became "intolerably hot" due to a failure of air-conditioner, the maximum temperature at Mays Landing, New Jersey (i.e., at the location of the courthouse and the courtroom at issue) was 44°F.  See <<http://www.wunderground.com/history/airport/KACY/ 1998/11/9/DailyHistory.html?req_city=Mays+Landing&req_state=NJ&req_statename=New+Jer sey>>.  Therefore, it appears, more likely than not, that the heating system of the courthouse (and the courtroom) was working exceedingly zealously, rather than its air-conditioning system failed.  However, since the source of temperature fluctuation is of no relevance to this Court's analysis, the Court presumes, without factual finding, that the air-conditioning system failed. However, the record shows that the jurors were minimally affected by heat, since the trial judge declared a lunch break when the heat surged and repairs were taken.  See Docket Entry No. 8-30, at 7 and 71 (reflecting the discussion of heat by Petitioner's trial judge, which was limited to

(continued...)

by one of the jurors was entirely heat (or other courtroom conditions) unrelated.[26]  Hence,

Petitioner's counsel had nothing material to which to object.  The record indicates, and with

abundance, that the jurors were highly attentive to the evidence proffered at trial, to the jury

charge given, carefully and thoughtfully deliberated on the issue of Petitioner's guilt with regard

to every criminal offense asserted by the State and entered a well-thought-through verdict.[27]

Therefore, the state courts' decisions to dismiss Petitioner's challenges based on his

counsel's election not to enter objections based on one juror's brief seizure and/or the warmth of

---

[25](...continued)
three groups of statement to the jurors: (a) the statement made early in the morning, "Members
of the jury, good morning.  I apologize for the heat.  We're trying to do something about it.
Regrettably, there's two court temperatures in this courthouse:  Too hot or too cold;" (b) the
statement made at lunch time, "Members of the jury, the heat is growing intolerable for all of us
at this point in time.  Supposedly, someone is on the way to fix it.  There is another courtroom
available, substantially cooler, so what we're going to do at this point in time is take a break for
lunch.  We'll resume at 1:30.  Everybody can move everything we need to into another
courtroom over the luncheon recess and we'll resume at 1:30 hopefully in more comfort to all of
us; so see after lunch.  We'll be in courtroom four"; and (c) the statement made after the lunch
break, "The rumors of courtroom four were greatly exaggerated").

[26]  The seizure occurred on November 4, 1998 (that is, *five days prior* to the date of
malfunctioning of heating/air-conditioning system in the courtroom).  See Docket Entry No. 8-
28.  On the day following the seizure, i.e., on November 5, 1998, prior to re-commencing
testimonial aspects of Petitioner's trial, the juror who suffered a seizure, being duly sworn,
averred to the trial judge – without making any reference to the heat or other possible
discomforts of the courtroom – that he was "feeling good," "very well physically able to
proceed" with his jury duties, did not seek any medical attention after the seizure, and did not
feel that seeking any medical attention after the seizure was necessary.  See Docket Entry No. 8-
29, at 4-5.

[27]  The jurors found Petitioner not guilty on the following charges: (a) hindering
apprehension by concealment of evidence; (b) tampering with physical evidence.  See Docket
Entry No. 8-37, at 17.  These findings indicate that the jurors were attentive during the trial,
cautiously noted even the finer evidential aspects offered to them (e.g., the jurors correctly took
note of the fact that Petitioner simply threw the knife into the kitchen sink, without wiping it off,
or rinsing it or hiding it in any way) and went through a thoughtful, careful deliberation process.

the courtroom were not an unreasonable application of Supreme Court precedent.  It follows that

Petitioner's challenges to the same effect raised in the instant action warrant no habeas relief.

**f.      One-Sentence Challenge to Performance of Appellate Counsel**

Finally, one sentence in the body of the Petition attacks the assistance rendered by

Petitioner's appellate counsel: Petitioner maintains that his appellate counsel should have raised

challenges based on Petitioner's trial counsel's alleged failure to enter "objections" in

connection with one juror's brief seizure and the warmth of the courtroom.  However, as the

PCR decisions of the Law Division, Appellate Division and Supreme Court of New Jersey

verify, such claims were facially deficient.  Therefore, Petitioner suffered no prejudice from the

decision of his appellate counsel not to raise these fruitless claims.

Moreover, and paramountly here, Petitioner's appellate counsel produced a massive

appellate application, see Docket Entry No. 8-2, raising six umbrella claims, some of which

included up to five sub-claims (each of which was meticulously copied by Petitioner for the

purposes of filing his Petition at bar).  Therefore, Petitioner has no factual basis to assert that his

appellate counsel was "objectively unreasonable [in the sense] that counsel failed to find

[arguably] nonfrivolous issues and to file a merits brief about them."  Smith, 528 U.S. at 285.

The fact that Petitioner's appellate counsel elected to argue, in good faith, issues that she

believed had "some potential for prevailing" and select only such claim "in order to maximize

the likelihood of success on appeal," id. at 288, cannot render her assistance defective.  As the

Supreme Court explained, appellate counsel does not have to raise even "every nonfrivolous

issue," Jones, 463 U.S. at 750; moreover, unlike the state PCR law, federal law and the rules of

ethics conclusively bar counsel from asserting facially frivolous challenges.  See Anders v.

53

California, 386 U.S. 738 (1967);  United States v. Parker, 2012 U.S. App. LEXIS 14525, at *4

(3d Cir. July 16, 2012).[28]  Therefore, the state courts' rejection of Petitioner's challenges to

performance of his appellate counsel was not an unreasonable application of Supreme Court

precedent and, if Petitioner's one-sentence reference to his appellate counsel's performance

aimed to state such a claim, that claim warrants no habeas relief.

## V.      CERTIFICATE OF APPEALABILITY

Having all Petitioner's claims and sub-claims dismissed on their merits, this Court must

now determine whether a certificate of appealability should issue.  See Third Circuit Local

Appellate Rule 22.2.  A certificate of appealability may issue "only if the applicant has made a

substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and "[a]

petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the

district court's resolution of his constitutional claims."  Miller-El v. Cockrell, 537 U.S. 322, 327

(2003).  Here, as the foregoing discussion illustrates, Petitioner raised a multitude of claims and

---

[28]  The bar on filing an Anders brief is an umbrella prohibition: it cannot turn of a mere technicality which puts form over substance.  As the Court of Appeals recently clarified, counsel cannot file a "quasi-Anders" brief, even if such filing is prompted by nothing but the counsel's client's adamant insistence on making such filing.  See United States v. Turner, 677 F.3d 570 (3d Cir. 2012) ( In Turner, the litigant's "counsel filed what might be called a 'quasi-Anders brief,' which raised a combination of colorable and frivolous arguments. . . .  In addition to . . . two [colorable] arguments [detected by counsel], counsel raised nine issues [which the litigant insisted on raising, while] explaining why the[se nine] issues [appeared wholly] frivolous" to counsel).  Analogously, New Jersey Rules of Professional Conduct bar counsel from raising meritless claims.  See <<http://www.judiciary.state.nj .us/oae/atty_disc/atty_disc.htm>>; accord the Model Rules of Professional Conduct offered by the American Bar Association, D.R. Nos. 1.1, 1.2(a), 2.1, 3.1, 3.3 (a)(1) and comments 1 and 2 to D.R. 3.1 (posing the same bar).  New Jersey state law (directing PCR counsel to raise all issues desired by the counsel's client) was not tested under Anders or the Rules of Professional Conduct.  See State v. Webster, 187 N.J. 254, 257 (2006) (merely concluding that a PCR attorney's "brief must advance the arguments that can be made in support of the petition and include defendant's remaining claims, either by listing them or incorporating them by reference so that the judge may consider them").

sub-claims.  However, regardless of the volume and variety of his challenges, he failed to make a

substantial showing of the denial of a constitutional right, and the Court is persuaded that jurists

of reason would not disagree with this conclusion.   Thus, no certificate of appealability will

issue.

**VI.     CONCLUSION**

For the foregoing reasons, this Court dismisses the Petition and denies Petitioner a writ of

habeas corpus, pursuant to 28 U.S.C. § 2254.  No certificate of appealability will issue, pursuant

to 28 U.S.C. § 2253(c)(2).   An appropriate Order accompanies this Opinion.


s/Renée Marie Bumb
RENEE MARIE BUMB
United States District Judge

Date:  September 27, 2012